In re DEL–MET CORP. and Del–Met of Tennessee, Inc., Debtors.

Susan R. Limor, Trustee, Plaintiff,

v.

Michael Buerger, Del-Met Winchester, Inc., DM Winchester, LLC, Zanini Auto Grup, S.A., Zanini Tennessee, Inc., General Motors Corporation, Johnson Controls, Inc., Lear Corporation, Bank One, N.A., BBK, Ltd., J.R. Buerger, Carson Fischer, P.LC., Conway Fischer, P.LC., Conway Mackenzie & Dunleavy, Del-Met Sales, Inc., GMAC Business Credit LLC, Briguglio Woods & Associates, CPA, PC., and Doe Defendants 1–100, Defendants.

Bankruptcy Nos. 01–13208–KML–3–7, 01–13209–KML–3–7.
Adversary No. 303–0873A.

United States Bankruptcy Court, M.D. Tennessee.

March 4, 2005.

Roy C. Desha, Nashville, TN, for Debtors.

## MEMORANDUM

KEITH M. LUNDIN, Bankruptcy Judge.

Ten remaining Defendants[1] move to dismiss the First Amended Complaint filed by the Trustee in these consolidated adversary proceedings. The motions will be granted in part and denied in part as explained below.

## THE PARTIES

The Plaintiff, Susan R. Limor, is the trustee for two Chapter 7 debtors, Del–

1. Plaintiff reports one completed settlement with Defendant Briguglio, Woods & Associates, Certified Public Accounts, and pending settlements with four other Defendants—Zanini Auto Grup, S.A.; Zanini Tennessee, Inc.; Del–Met Sales, Inc.; and, J.R. Buerger.

Met Corporation ("DMC") and Del–Met of Tennessee, Inc. ("DMT").

Defendant Michael Buerger ("Buerger") is the 100 percent owner and only director of DMC and DMT. Buerger also owned 100 percent of Defendant Del–Met Winchester, Inc. ("DMW"). Collectively, Debtors DMC and DMT and Defendant DMW are sometimes called the "Del–Met companies."

Defendants General Motors Corporation ("GM"), Johnson Controls, Inc. ("JCI") and Lear Corporation ("Lear") were customers of the Del–Met companies. The Plaintiff refers to these three Defendants as the "Controlling Customers."

Defendants Bank One, N.A. ("Bank One") and GMAC Commercial Finance LLC (successor by merger to GMAC Business Credit, LLC) ("GMAC") provided financing to the Del–Met companies.

Defendant BBK, Ltd. ("BBK") provided management to the Debtors.

Defendant Conway MacKenzie & Dunleavy ("CMD") is a consulting firm that provided financial and accounting services to the Debtors.

Defendant Carson Fischer, PLC ("CF") provided legal services to the Debtors.

### PRIOR PROCEEDINGS

DMC and DMT filed Chapter 7 cases on November 28, 2001. Susan Limor was appointed Chapter 7 trustee. Two years after the petitions, on November 28, 2003, the trustee filed this adversary proceeding styled: "Trustee's Complaint for the Avoidance and Return of Preferential Payments and Fraudulent Transfers, Equitable Subordination, and Damages, Together With Objections and Counterclaims to Creditor–Defendants' Claims" ("original Complaint").

After a pretrial conference on April 19, 2004 and a skirmish with respect to the scope of discovery, the Trustee filed a First Amended Complaint on June 1, 2004. Motions to dismiss were filed by all Defendants that challenge the sufficiency of the original Complaint and the First Amended Complaint. Defendants' Motions also challenge whether the First Amended Complaint could cure alleged defects in the original Complaint given that the limitation on a trustee's avoidance powers in 11 U.S.C. § 546(a)[2] expired on November 28, 2003.

Four days before oral argument on Defendants' Motions to dismiss, the Trustee filed an "Expedited Motion for Leave to Supplement Trustee's First Amended Complaint." Citing Rule 15(d) of the Federal Rules of Civil Procedure, the Plaintiff sought to add to the First Amended Complaint "events which occurred after the date that the plaintiff's complaint was filed." The supplemental material offered by the Plaintiff was a discovery response from Defendant Buerger listing "payments made by Del–Met companies" to Buerger between December 2000 and January 2004. Defendant Buerger objected to Plaintiff's expedited motion to supplement the First Amended Complaint.

### FACTS

These facts are as alleged in the Plaintiff's First Amended Complaint and do not constitute findings by the court.

Prior to 2000, the Del–Met companies— DMC, DMT and DMW—were a highly profitable supplier of parts to the automo-

---

**2.** (a) An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of–

(1) the later of–
 (A) 2 years after the entry of the order for relief[.]

tive industry. Buerger owned the stock of all three entities.

In 1999, DMC, DMT and DMW had over 500 employees and total sales of $71,583,567. As of December 31, 1999, Del–Met had collectable accounts receivable of $18,507,556. Assets of Del–Met at the end of 1999 included machinery and equipment valued at $20,274,791, buildings and improvements totaling $2,649,438 and patents and trademarks valued at $122,989. In 1999, Del–Met distributed over $3,200,000 to Buerger. At December 31, 1999, DMC had retained earnings of $7,259,320. In contrast, at that same date, DMW had retained earnings of negative $711,844.

For several years before 2000, Bank One was Del–Met's lead lender. Bank One had a security interest in all of DMC's and DMT's machinery, equipment and accounts receivable. As of December 31, 1999, Del–Met owed Bank One $12,818,-622—approximately $5,000,000 less than the collectible accounts receivable owed to Del–Met at that time. The debts of Del–Met to Bank One were personally guaranteed by Buerger.

GM, JCI and Lear were Del–Met's three largest customers. Del–Met was a direct supplier of automotive parts to GM and sold parts to JCI and Lear who then sold products fabricated from those parts to GM and other automobile companies.

In 1999, Del–Met had a contract with GM to manufacture and supply the center console for the Cadillac Escalade at a fixed price. A sharp increase in the price of leather rendered this contract unprofitable. In 1999 and 2000, Del–Met expanded sales to JCI and Lear including undertaking tooling management programs at the request of JCI and Lear.

By early 2000, Del–Met's cash position was negatively impacted by: (1) inability to properly manage the cash requirements of the tooling programs; (2) assumption of a major loss contract from Lear; (3) the sharp increase in the price of leather to fulfill the Escalade contract with GM; and (4) operating losses in the traditional production of wheel covers due to capacity constraints and quality problems.

In 2000, Del–Met informed GM that it had stopped production of the center console for the hot-selling Cadillac Escalade due to the prohibitive cost of leather. Del–Met asked GM to allow a price increase under the Escalade contract to cover the increased cost of raw materials. GM refused to adjust the contract price and threatened to stop payments on nearly $20,000,000 in accounts receivable and to assert an offset for Del–Met's nonperformance of the Escalade contract. Similar problems arose under the contracts with JCI and Lear.

By September 2000, the Controlling Customers' refusal to pay accounts receivable rendered DMC and DMT unable to pay their liabilities as they became due.

In late 2000, the Controlling Customers "brought in" BBK to "take over" the operations of Del–Met and brought in CMD to take over the accounting functions of Del–Met. In his cross-claim against GM, JCI and Lear, Defendant Buerger describes this "take over" by the Controlling Customers more forcefully:

> In early 2001, the Customers assumed control of all aspects of the operations of DMC and DMT. The customers engaged BBK, Limited ("BBK"), to manage the operations of DMC and DMT on a day-to-day basis. Individual representatives of BBK entered the premises of DMC and DMT for varying periods of time and assumed and performed all key management functions. In many cases, existing personnel of DMC and DMT were excluded, in whole or in part, from

further participation in their historical duties. From this point forward, Michael Buerger was effectively precluded from further participation in the operations or management of DMC or DMT. (Michael Buerger's Cross Claim Against Defs. General Motors Corp., Johnson Controls, Inc., and Lear Corp. ¶ 8.)

Although paid by Del–Met, BBK and CMD managed and operated Del–Met for the benefit of the Controlling Customers without regard to the impact on DMC, DMT or their creditors. BBK was only interested in funding materials and labor to fulfill the Del–Met contracts with GM, JCI and Lear. BBK refused to pay other "nonessential" debts. BBK and CMD managed and operated the Del–Met entities to fulfill unprofitable contracts with GM and JCI. On the Escalade contract alone, Del–Met was losing over $500,000 a month. BBK and CMD "used DMC and DMT for the financial benefit of the Controlling Customers ... drastically increas[ing] the amount of debt incurred by DMC and DMT.... BBK and CMD ... mismanaged DMC and DMT for the financial benefit of the Controlling Customers." (First Am. Compl. ¶ 20.)

In furtherance of this scheme, beginning in mid–2000 and continuing into 2001, the Controlling Customers made direct payments to Del–Met's tooling vendors to gain control of "hostaged" tools and made direct payments to Del–Met's critical material suppliers to maintain production of parts needed by the Controlling Customers.

In early 2001, the Controlling Customers approached Bank One—Del–Met's lender—about restructuring Bank One's debt and collateral position. As "bargaining leverage," GM asserted that it would stop paying its accounts receivable and would exercise $6,500,000 in offsets against the bank's collateral if Bank One did not renegotiate its loan and collateral position.

On April 10, 2001, the Controlling Customers, Bank One, Del–Met and Buerger entered into an "Accommodation Agreement." As described by the Plaintiff, this agreement:

> provided that Bank One would forbear on its loan default claims through July 31, 2001 to enable GM, JCI and Lear to meet Del–Met's future working capital needs outside of bankruptcy, and so GM, JCI and Lear could attempt to find buyers for Del–Met's facilities to continue their production of parts.... GM, JCI and Lear agreed to up-front payments to Bank One of approximately $6,000,000 and defendant GMAC ... was to provide funding and ... working capital loans to Del–Met.... Bank One 'sold' its lien position in Del–Met's collateral to the Controlling Customers.

(First Am. Compl. ¶¶ 24 & 25.) The Controlling Customers required Del–Met to pay $750,000 in fees to Defendants CF and CMD in connection with this agreement.

Between January of 2000 and November 28, 2001 (when DMC and DMT filed bankruptcy), DMC's and DMT's secured debt to Bank One and GMAC was reduced by $6.9 million—from $12.8 million to $5.9 million. During that same time, DMC's and DMT's unsecured debt increased by $22 million—from $21.3 million to $43.3 million.

In addition to the Accommodation Agreement, the Controlling Customers and Buerger carried out a plan to shift the assets and business operations of DMC and DMT to DMW. Although DMW had little or no value at the end of 1999, by the time DMC and DMT filed bankruptcy in November 2001, the Controlling Customers had transferred a substantial portion of DMC's assets to DMW. In March of 2003—despite protests from the bankruptcy trustee for DMC and DMT—the assets

of DMW were sold to Zanini Auto Grup, S.A. for over $5,200,000. This sale of assets assured GM of continued production of the center console for the "still hot-selling Cadillac Escalade."

## DISCUSSION

### I. Legal Standard

Defendants' Motions to dismiss challenge the sufficiency of the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure and Rule 7012 of the Federal Rules of Bankruptcy Procedure.[3] On a motion to dismiss under Rule 12(b)(6), the factual allegations in the complaint are presumed to be true and all factual inferences must be drawn in the plaintiff's favor and against the Defendant. *See, e.g., Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.,* 399 F.3d 651, 664–65 (6th Cir.2005). As stated by the Supreme Court, the complaint should not be dismissed unless " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 249–50, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (citation omitted). *See also Lawler v. Marshall,* 898 F.2d 1196, 1199 (6th Cir. 1990) (plaintiff "need only give a 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.' ") (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Rule 12(b)(6) imposes a substantial burden on the moving party: The trial court should not dismiss a complaint unless " 'the statement of the claim affirmatively shows that the plaintiff can prove *no* set of facts that would entitled him to relief.' " *New England Health Care Employees Pension Fund v. Ernst & Young, LLP,* 336 F.3d 495, 501 (6th Cir.2003) (quoting *Ott v. Midland–Ross Corp.,* 523 F.2d 1367, 1369 (6th Cir.1975)).

The Rules of Civil Procedure do not require a plaintiff to set out in detail the facts in support of each cause of action. Rather, the Rules require " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). *See also* FED. R. CIV. P. 8(a)(1).

A court ruling on a Rule 12(b)(6) motion can consider materials in addition to the complaint "if such materials are public records or are otherwise appropriate for the taking of judicial notice." *New England Health Care Employees Pension Fund,* 336 F.3d at 501; *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015 (5th Cir. 1996).

### II. Relation-back of First Amended Complaint

The First Amended Complaint was allowed under Rule 15(a) of the Federal

---

**3.** The Motions to dismiss filed by some Defendants argue that Plaintiff lacks standing to maintain some or all of the causes of action in the First Amended Complaint. It is arguable that this standing challenge is jurisdictional under Rule 12(b)(1). For current purposes, motions under 12(b)(1) and 12(b)(6) invoke the same legal standards: All well-pleaded facts are accepted as true and the complaint must be construed in the light most favorable to the plaintiff. *See, e.g., City of Monroe Employees Ret. Sys. v. Bridgestone Corp.,* 399 F.3d 651, 664–65 (6th Cir.2005); *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1088 (2d Cir. 1995); *Pereira v. Cogan (In re Trace Int'l Holdings, Inc.),* 2001 WL 243537, at *3 (S.D.N.Y. Mar.8, 2001).

Rules of Civil Procedure by order entered June 8, 2004. The Motions to dismiss challenge whether the First Amended Complaint relates-back to the filing of the original Complaint on November 28, 2003. Defendants argue that their Motions to dismiss with respect to avoidance and recovery actions are measured only against the facts and allegations in the original Complaint because the First Amended Complaint was filed after the statute of limitations in 11 U.S.C. § 546(a) expired.

Counts 1 and 6 of the original Complaint raise causes of action to recover fraudulent conveyances or preferential transfers under §§ 547 or 548 of the Bankruptcy Code. Under § 546(a), these actions must commence within two years of the orders for relief in the DMC and DMT bankruptcy cases. The two years expired on the day the original Complaint was filed, November 28, 2003. The First Amended Complaint was filed on June 1, 2004.

Under Rule 15(c) of the Federal Rules of Civil Procedure, amendment of a pleading "relates back to the date of the original pleading when (1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." FED. R. CIV. P. 15(c). The Trustee cites no provision of bankruptcy law that addresses relation back and the limitation in § 546(a).

The Sixth Circuit has explained when an amended complaint that straddles the statute of limitations relates back to save a cause of action under Rule 15(c)(2). In *Miller v. American Heavy Lift Shipping*, 231 F.3d 242 (6th Cir.2000), the estates of deceased seamen filed complaints under the Jones Act alleging that the decedents were exposed to "hazardous substances other than asbestos." After the three-year statute of limitations for Jones Act actions, the plaintiffs filed amended complaints alleging that the decedents "suffered from leukemia as a result of exposure to benzene." *Miller*, 231 F.3d at 246. The Defendants moved for summary judgment arguing that the amended complaints did not relate back to the original complaints because the general allegation of exposure to "hazardous substances" was insufficient to give notice of benzene-related claims. The district court held that the amended complaints did not relate back because accepting the plaintiff's position would mean that the Defendants were "forever on notice of claims arising out of exposure to any hazardous substance." *Miller*, 231 F.3d at 246. The Sixth Circuit reversed giving this expansive account of notice pleading and the role of relation back under Rule 15(c) when a statute of limitations has intervened:

> There can be no dispute that our modern rules of civil procedure are based on the concept of "simplified 'notice pleading,'" and that "[a]ll pleadings shall be so construed as to do substantial justice." This fundamental tenor of the Rules is one of liberality rather than technicality, and it creates an important context within which we decide cases under the modern Federal Rules of Civil Procedure.... [W]hether a statute of limitations will be permitted to bar an amended claim turns on whether the amended claim arose out of the same conduct, transaction, or occurrence as that set forth in the original complaint:
>
> > The rule is based on the notion that once litigation involving particular conduct or a given transaction or occurrence has been instituted, the parties are not entitled to the protection of the statute of limitations against the later assertion by amendment of

defenses or claims that arise out of the same conduct, transaction, or occurrence as set forth in the original pleading.

"[T]he thrust of Rule 15 is to reinforce the principle that cases 'should be tried on their merits rather than the technicalities of pleadings.'" Thus, a court will permit a party to add even a new legal theory in an amended pleading as long as it arises out of the same transaction or occurrence. Likewise, "[a]n amendment that alleges added events leading up to the same injury may relate back."

Although the focus of our inquiry into whether an amendment relates back pursuant to Rule 15(c)(2) is whether it arises from the same conduct, transaction, or occurrence, we look to other factors as well. "Undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment are all factors which may affect the decision." Of these factors, "[n]otice and substantial prejudice to the opposing party are critical ... in determining whether an amendment should be granted."

*Miller*, 231 F.3d at 247–50 (internal citations omitted).

In a footnote in *Miller*, the Sixth Circuit acknowledged that other courts have formulated two tests for relation back under Rule 15(c): "(1) Whether the evidence offered in support of the original claim would prove the new claim, and (2) whether the new claim alters the 'when, where, what, or how' of the alleged injury." *Miller*, 231 F.3d at 249 n. 6. The Sixth Circuit rejected these formulations as "too mechanical for the liberal approach to Rule 15(c)." *Id.*

Recent bankruptcy court decisions reveal some debate with respect to amended pleadings, relation-back, the statute of limitations in § 546(a) and avoidance and recovery litigation. *See, e.g.,* Lisa Hill Fenning & Jayne South, *Pleading Preferences in Delaware: Signs of an Emerging Doctrinal Split or Merely Pent–Up Frustrations With Sloppy Practice?*, 5 NORTON BANKR. L. ADVISER 1 (2004).

Some bankruptcy courts require great specificity with respect to dates, amounts, nature of transaction, etc., else a complaint to avoid a preference or to recover a fraudulent conveyance fails to support relation-back under Rule 15 and is subject to dismissal upon Rule 12(b)(6) review. *See, e.g.,* Peltz v. CTC Direct, Inc. (In re MBC Greenhouse, Co.), 307 B.R. 787 (Bankr. D.Del.2004); *TWA Inc. Post Confirmation Estate v. Marsh USA, Inc. (In re TWA Inc. Post Confirmation Estate),* 305 B.R. 228 (Bankr.D.Del.2004); *New Bedford Capacitor, Inc. v. Sexton Can Co. (In re New Bedford Capacitor, Inc.),* 301 B.R. 375 (Bankr.D.Mass.2003); *Valley Media, Inc. v. Borders, Inc. (In re Valley Media, Inc.),* 288 B.R. 189 (Bankr.D.Del.2003). Other courts conclude that notice pleading under the Federal Rules is satisfied with less specificity—more welcoming of the relation-back of amended pleadings to supply the details of an alleged preference or fraudulent conveyance. *See, e.g., Official Comm. of Unsecured Creditors of The IT Group v. Brandywine Apts. (In re The IT Group, Inc.),* 313 B.R. 370 (Bankr.D.Del. 2004); *Neilson v. Southern (In re Webvan Group, Inc.),* Adv. Pro. No. 03–54365, 2004 WL 483580 (Bankr.D.Del. Mar.9, 2004); *Family Golf Ctrs., Inc. v. Acushnet Co. (In re Randall's Island Family Golf Ctrs., Inc.),* 290 B.R. 55 (Bankr.S.D.N.Y.2003).

Some courts have observed that a fraudulent conveyance action involves fraud for purposes of Rule 9(b) of the Federal Rules

of Civil Procedure,[4] thus a complaint under § 548 requires greater specificity. *See, e.g., Chipwich, Inc. v. Peltz (In re Chipwich, Inc.)*, Adv. Pro. No. 92–9943A, 1993 WL 118000 (Bankr.S.D.N.Y. Mar.31, 1993). Other courts point out that § 548, when it requires actual fraud, requires fraud only by the transferor; thus, when the defendant is the transferee, Rule 9(b) has no application. *See, e.g., Pardo v. Gonzaba (In re APF Co.)*, 308 B.R. 183 (Bankr. D.Del.2004) (" 'in the bankruptcy context, Rule 9(b) should be interpreted liberally, particularly when the trustee ... is bringing the action.' ") (*quoting Levitt v. Riddell Sports, Inc. (In re MacGregor Sporting Goods, Inc.)*, 199 B.R. 502 (Bankr.D.N.J. 1995)); *Yaeger v. Magna Corp. (In re Magna Corp.)*, Adv. Pro. No. 03–9032, 2003 WL 23211571 (Bankr.M.D.N.C. Nov.28, 2003); *Network Enters., Inc. v. APBA Offshore Prods., Inc.*, No. 01 Civ. 11765(CSH), 2002 WL 31050846 (S.D.N.Y. Sept.12, 2002); *Harrison v. Entertainment Equities, Inc. (In re Rave Communications, Inc.)*, 138 B.R. 390 (Bankr. S.D.N.Y.1992). Preferences under § 547 involve no fraud and are not subject to the greater specificity provisions of Rule 9(b). *See, e.g., King's Place, Inc. v. First Nat'l Bank of Strasburg (In re King's Place, Inc.)*, 6 B.R. 305 (Bankr.E.D.Pa.1980).

■ The inconsistent but strongly held views revealed in these bankruptcy cases demonstrate the wisdom of the nonmechanical approach to relation-back in *Miller*—especially when the statute of limitations in § 546(a) is in play and avoidance actions that produce dividends for creditors may be lost in the nuances. Applying *Miller* requires a count-by-count comparison of the original Complaint and the First Amended Complaint.

## A. Count 1

■ Count 1 of the original Complaint alleged, "Defendant Buerger caused millions of dollars in cash to be fraudulently transferred from DMC to DMW .... Defendant Buerger caused numerous assets of DMC and DMT to be transferred to DMW for no or insufficient consideration.... The transfer of assets from DMC and DMT to DMW are voidable as fraudulent transfers under § 548(a)(1)(B) of the Bankruptcy Code."

The First Amended Complaint made these additions to Count 1:

1. "[I]n 1999 Buerger had DMC transfer $2,872,650 to DMW and then had DMW distribute those funds to himself, resulting in a $2,872,650 fraudulent transfer to Buerger."

2. "[S]ometime in 2000 or 2001, four pieces of gas equipment (LGC–1–2, SN No. 9908012; LGC–1–2, SN No. 9910–16; PID–60, SN No. PID–013; and PID–6, SN No. PID–XXX) were transferred from DMC to DMW for no cash consideration. This transfer was made when Lear moved its business from DMC to DMW because DMW had taken over as the new supplier for the Hummer program instead of DMC."

3. "[O]n July 20, 2001, DMC filed suit against TKA Corporation ... for $1,944,462.44 that was owed by TKA to DMC.... On November 27, 2001 (one day before DMC filed for bankruptcy), Buerger had DMC assign the claims in the TKA suit to Defendant DM Winchester ... for no cash consideration."

(First Am. Compl. ¶¶ 32, 33 & 34.)

Under *Miller*, these additions to Count 1 of the original Complaint relate back to

---

4. Plaintiff alleging fraud must state "the circumstances constituting fraud ... with particularity." Fed. R. Civ. P. 9(b).

the filing of the original Complaint. The first addition is a specific example of the "millions of dollars in cash" in the preceding sentence of Count 1 of the original complaint.[5] The First Amended Complaint simply pleads with more specificity the conduct described in the original Complaint: the fraudulent transfer of millions of dollars.

The second and third additions to Count 1 fall in the same category. Gas equipment is identified as an asset of DMC that was transferred to DMW for no cash consideration. A more specific time is provided by describing a change in business relationship that coincided with the equipment transfer.

The description of a lawsuit and the assignment of that lawsuit to a defendant on the day before bankruptcy is another specific example of the conduct alleged in the original Complaint—an asset of the debtors transferred to a defendant for no consideration. This amendment relates back under *Miller*.

Plaintiff alleges in Count 2 of the First Amended Complaint that computer equipment, software and patents (listed on attachments) were "among the assets of DMC transferred to DMW and then transferred from DMW to Zanini." Paragraph 37 of Count 2 cross-references the gas equipment in Count 1 but placement of this allegation in Count 2 of the First Amended Complaint is confusing. Although Count 2 states a cause of action for turnover under § 542 against Zanini, the purchaser of assets from DMW, it is reasonably inferred that the Plaintiff intended to include the computer equipment, software and patents in the assets alleged to have been fraudulently conveyed from

DMC to DMW in Count 1. The listing of these specific assets in the First Amended Complaint relates back to the conduct described in the original Complaint under *Miller*.

**B. Count 2**

■ Count 2 of the original Complaint alleged an action for turnover under § 542 with respect to assets sold to Zanini after DMC and DMT filed bankruptcy. The First Amended Complaint adds a sentence that gas equipment, computer equipment, software and patents were "among the assets of DMC transferred to DMW, and then transferred from DMW to Zanini." The conduct alleged in Count 2 of the original Complaint is made specific by identifying property of the bankruptcy estate that was transferred from DMC to DMW and then to Zanini. The additions to Count 2 relate back.

**C. Count 5 [6]**

■ Count 5 of the original Complaint alleges that Defendants GM, JCI, Lear, BBK and CMD "became *de facto* directors of DMC and DMT" after September, 2000, "thereby owing those entities fiduciary duties." The First Amended Complaint changed "de facto directors" to "control persons," added that these Defendants "exerted sufficient influence and control over the affairs of Del–Met so as to constitute 'insiders' within the meaning of § 101(31) of the Bankruptcy Code," and concluded with the same "thereby owing these entities fiduciary duties." Count 5 of both complaints then alleges breaches of fiduciary duties and injury to the debtors.

The amendment to Count 5 takes the same conduct alleged in the original Complaint and modifies the theory for recovery

---

**5.** As explained below, this 1999 transfer does not survive the Defendants' motions to dismiss notwithstanding that it relates back to the date of filing of the original complaint.

**6.** Counts 3 and 4 of the original Complaint were not amended.

(breach of fiduciary duties) by changing the legal basis on which fiduciary duties arose in the named Defendants. These amendments to Count 5 relate back under Rule 15(c) and *Miller*: "[A] court will permit a party to add even a new legal theory in an amended pleading as long as it arises out of the same transaction or occurrence." *Miller*, 231 F.3d at 248.

## D. Count 6

■ Count 6 of the original Complaint stated, "in an amount as yet undetermined and on specific dates as yet undetermined other than from and after November 28, 2000, preference payments prohibited by § 547(b) of the Bankruptcy Code were made by DMC and/or DMT" to various Defendants. The original Complaint alleged that the elements of a preference under § 547(b) were present at the time of these transfers.[7]

The First Amended Complaint added three paragraphs to Count 6:

50. On the following dates the following sums were wire transferred by DMC to BBK, GM and JCI:

| Date | Amount |
|------|--------|
| 2/15/01 | $ 38,610.00 |
| 3/1/01 | $ 74,650.00 |
| 3/28/01 | $ 94,000.00 |
| 4/10/01 | $ 40,000.00 |
| 4/26/01 | $ 91,000.00 |
| 5/10/01 | $ 36,000.00 |
| 5/24/01 | $ 84,000.00 |
| 6/13/01 | $ 29,600.00 |

51. In addition, on the following dates the following sums were transferred by DMC (either directly or through BBK) to CMD:

| Date | Amount |
|------|--------|
| 1/12/01 | $ 25,000.00 |
| 1/25/01 | $ 82,953.25 |
| 1/30/01 | $ 80,835.88 |
| 4/18/01 | $542,370.72 |
| 5/14/01 | $ 38,181.03 |
| 8/20/01 | $ 14,318.75 |

52. In addition, on June 28, 2001, $8,000 was transferred from DMT to DMW.

(First Am. Compl. ¶¶ 50, 51 & 52.)

Count 6 of the original Complaint gave a range of dates for preferential transfers. The First Amended Complaint lists actual dates within that range. The original Complaint stated the amounts of the challenge transfers were "as yet undetermined." The First Amended Complaint lists 15 specific amounts. The original Complaint named both debtors as possible transferors and nine Defendants as possible transferees. The First Amended Complaint identifies which debtor made the transfers. The First Amended Complaint narrows the transferees to three with respect to eight of the listed transfers, to CMD (and BBK) "directly or indirectly" with respect to six transfers, and to DMW with respect to one transfer.

---

7. Regurgitation of the statutory elements of a preference in Count 6 of the original Complaint might fail to state a cause of action under some of the reported decisions cited above. *See, e.g., In re TWA Inc. Post Confirmation Estate*, 305 B.R. at 232–33 (complaint is deficient for "failure to provide the nature and amounts of the debts, dates of payment transactions, amounts of the payment transactions, etc. ... the complaint only provides one aggregate amount and then paraphrases the relevant statutory language."). But this, of course, is not outcome determinative whether the First Amended Complaint relates back to the filing of the original Complaint for purposes of § 546(a) and Rule 15(c). An amended pleading can relate back to and cure defects in an earlier pleading that was or otherwise would be defective for failure to satisfy Rule 8 or Rule 12(b)(6). *See In re Randall's Island Family Golf Ctrs., Inc.*, 290 B.R. at 65–6 ("an amended pleading may relate back under FED. R. CIV. PRO. 15(c) to an earlier pleading that was dismissed for failure to satisfy Rule 8(a).") (citing *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 611 n. 8 (4th Cir.1980); *United States v. Somers Constr. Co.*, 184 F.Supp. 563, 567 (D.Del. 1960); *Independent Productions Corp. v. Loew's, Inc.*, 22 F.R.D. 266 (S.D.N.Y.1958)).

All of these amendments to Count 6 relate back under Rule 15(c). The First Amended Complaint simply adds detail to the conduct alleged in the original Complaint—preferential transfers from a debtor to one or more of the Defendants within the year before bankruptcy.

### E. Count 12 [8]

■ Count 12 of the First Amended Complaint alleges a new cause of action based on conduct contained in the original Complaint and some new facts. Count 12 alleges that GM, JCI, Lear and GMAC loaned money to Del–Met when the Defendants knew that Del–Met was insolvent and that these loans should be "recharacterized from debt to equity and a constructive trust imposed on any loan repayments that were made by Del–Met to these defendants."

In several places, the original Complaint describes lending by the Controlling Customers. For example, paragraphs 19–22 describe an Accommodation Agreement in April, 2001, which included "up-front payments" from the Controlling customers to Bank One and the sale of a lien position to the Controlling Customers. Paragraph 63 of the First Amended Complaint details three specific loans from GM, Lear and JCI to Del–Met at the same time as the Accommodation Agreement. As detailed below, these three loans total exactly the $750,000 that Del–Mete paid to CF and CMD in connection with the Accommodation Agreement—a payment alleged in paragraph 22 of the original Complaint. The new legal theory and the supplemental facts in Count 12 arise from conduct and occurrences stated in the original Complaint. Count 12 relates back.

### F. Count 13

■ Count 13 of the First Amended Complaint states a new legal theory based on conduct and transactions contained in the original Complaint. Count 13 alleges that DMC, DMT and DMW "were so inter-related ... that the three corporations constitute a single business enterprise." Count 13 demands that the $5.2 million received from Zanini for the sale of assets by DMW "constitutes property of the bankruptcy estate."

The facts collected in Count 13 are sprinkled here and there in the original Complaint. Count 13 alleges a new cause of action. Some Defendants characterize Count 13 as a hybrid of the alter ego/veil piercing/single-business enterprise theories for holding one corporation liable for the debts of another. No new facts are alleged, simply a different theory for recovery based on facts alleged in the original Complaint. Under *Miller*, Count 13 relates back under Rule 15(c).

### G. Other Factors Bearing on Relation Back under Rule 15(c)

■ As explained in *Miller*, after assessing whether an amended pleading raises the same conduct, transaction or occurrence as the original, Rule 15(c)(2) requires consideration of other factors: "Undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of amendment are all factors which may affect the decision.... Of these factors, 'notice and substantial prejudice to the opposing party are critical ... in determin-

---

8. The First Amended Complaint made no changes to Counts 7, 8, 9 and 10. Count 11 of the original Complaint is renumbered as Count 14 of the First Amended Complaint, without changes.

ing whether an amendment should be granted.'" *Miller,* 231 F.3d at 250.

There was some delay in the filing of the First Amended Complaint but that delay was not undue or prejudicial. The pretrial order allowed the Plaintiff until May 28, 2004 to file an amended pleading. The Plaintiff was allowed to file the First Amended Complaint one day after the end of that period. (Order Granting Motion for One–Day Extension, June 8, 2004.) There is no evidence of bad faith by the Plaintiff. The First Amended Complaint was filed well within the time period for discovery and ten months before the scheduled trial.

The Defendants cannot claim to be without notice of the conduct and most of the causes of action in the First Amended Complaint. Albeit more generally than the First Amended Complaint, the original Complaint alleged fraudulent conveyances, preferences and breaches of fiduciary duty, all in the context that the Controlling Customers installed surrogates to manage the debtors for the benefit of the Controlling Customers, at great detriment to the debtors. The First Amended Complaint supplies specific fraudulent or preferential transfers during the general time period in the original Complaint. With respect to breaches of fiduciary duty, the First Amended Complaint adds legal theories using facts from the original Complaint. Counts 12 and 13 describe new causes of action based on conduct and transactions in the original Complaint. The Defendants were on notice to collect and preserve evidence relating to transfers of assets and payments during the year before

the petitions. Relation back of the First Amended Complaint has not been shown to produce substantial prejudice to any Defendant.

### III. The "Supplemental" Complaint

On August 6, 2004, Plaintiff filed an Expedited Motion for Leave to Supplement the First Amended Complaint under Federal Rule of Civil Procedure 15(d).[9] This Motion offers "newly discovered information" in the form of a discovery response from Defendant Buerger that lists payments by Debtor DMC and Defendant DMW to Buerger from December 2000 through January 2004.

■ The First Amended Complaint was filed (with leave of court) on June 1, 2004. The transactions listed in the Supplement all occurred before June 1, 2004. Supplementation under Rule 15(d) is not appropriate. *See, e.g., William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1057 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 58, 74 L.Ed.2d 61 (1982) ("The purpose of Rule 15(d) is to promote as complete an adjudication of the dispute between the parties as possible by allowing the addition of claims which arise after the initial pleadings are filed.").

Plaintiff's Motion is more properly addressed as a request to further amend the First Amended Complaint under Rule 15(a). As explained in Plaintiff's Motion, the payments listed by Defendant Buerger relate to Plaintiff's claims that voidable preferences and/or fraudulent conveyances

---

9. Rule 15(d) provides:

Supplemental Pleadings. Upon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented. Permission may be granted even though the original pleading is defective in its statement of a claim for relief or defense. If the court deems it advisable that the adverse party plead to the supplemental pleading, it shall so order, specifying the time therefor.

were made to Buerger directly by DMC, or indirectly by DMW through control of the Del–Met Corporations.

For purposes of Rule 15(a), the specific dates and amounts in the Supplement offered by Plaintiff on August 6, 2004, are not distinguishable from the specific dates and amounts provided on June 1, 2004, in Counts 1 and 6 of the First Amended Complaint. Defendant Buerger is obviously aware of these transactions as he is the source of this list. The Supplement is allowed as a Second Amendment to the complaint under Rule 15(a). These specific instances of the general conduct alleged in the original Complaint relate back under Rule 15(c) for the reasons explained above with respect to Counts 1 and 6 of the First Amended Complaint. As requested by Plaintiff, the list will be Exhibit A to the First Amended Complaint.

### IV. Choice of Law with Respect to State Law Causes of Action

██ Following oral argument, the parties were invited to brief what law applied to the state law causes of action. (Order Amending Pretrial Order, Aug. 18, 2004.) By Stipulation filed August 27, 2004, Plaintiff and the remaining Defendants agreed that Tennessee law would govern the state law claims in Counts 5, 8, 9, 10, 13 and 14.

The court accepts the parties' choice of law stipulation with respect to Count 8 (unjust enrichment), Count 9 (contract) and Count 14 (accounting). Alter ego or single business enterprise liability arises from fraudulent use of corporate form, thus the parties' stipulation of Tennessee law for Count 13 also seems correct. Discussed in more detail below, to the extent Counts 5 and 10 allege torts that are not based on breach of the statutory duties of corporate officers and directors, the parties' stipulation of Tennessee law is sound. However, Counts 5 and 10 also allege breach of fiduciary duties imposed on corporate officers and directors. In matters of corporate governance, the parties' stipulation of Tennessee law collides with firmly established doctrine favoring the law of the states of incorporation—New York for DMC; Delaware for DMT.

██ Claims that involve the internal affairs of a corporation should be resolved in accordance with the law of the state of incorporation. *See, e.g., First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 621, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983). "The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands." *Edgar v. MITE Corp.,* 457 U.S. 624, 645, 102 S.Ct. 2629, 2642, 73 L.Ed.2d 269 (1982) (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 302, Comment *b,* at 307–08 (1971)).

Tennessee has codified the internal affairs doctrine: Tennessee corporation statutes "do not authorize this state to regulate the organization or the internal affairs of a foreign corporation authorized to transact business in this state." TENN. CODE ANN. § 48–25–105(c) (West 2004). Put another way, even accepting the parties' stipulation, Tennessee law would direct us back to the states of incorporation to determine the fiduciary duties of corporate actors for purposes of Counts 5 and 10.

### V. Motions to Dismiss

### A. Count 1

██ Count 1 of the First Amended

Complaint[10] alleges transfers that are avoidable as fraudulent conveyances under § 548(a)(1)(B).[11] Under § 548(a)(1)(B):

> The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> ....
>
> (B)(I) received less than reasonably equivalent value in exchange for such transfer or obligation; and
>
>> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>>
>> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was unreasonably small capital; or
>>
>> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1)(B).

Defendants Buerger and DMW argue that Count 1 fails to state a cause of action because the amount of money is not specified, the transferees are not identified, the absence of "reasonably equivalent value" is not alleged and at least one of the transfers occurred outside the one-year period in § 548(a).

Paragraph 33 of the First Amended Complaint alleges, "sometime in 2000 or 2001, four pieces of gas equipment ... were transferred from DMC to DMW for no cash consideration." The gas equipment is identified with what appear to be serial numbers. It is alleged that the transfer was made "when Lear moved its business from DMC to DMW because DMW had taken over as the new supplier of the Hummer program." This paragraph states that DMC and/or DMT "were insolvent ... or were rendered insolvent" as a result of the transfers.

These bankruptcy cases were filed on November 28, 2001. The one-year period in § 548(a) reaches back to November 28, 2000. The claim that gas equipment was transferred "sometime in 2000 or 2001" could be barred by the one-year limitation in § 548(a) if the transfer occurred before November 28, 2000. But on these motions to dismiss, the issue is whether the Plaintiff can prove any statement of facts in support of this claim that would fall within § 548(a). *See, e.g., Miller v. Currie,* 50 F.3d 373, 378 (6th Cir.1995) ("Because it is conceivable that a set of facts could be proved in support of the complaint's allegations under which Miller would be entitled to relief ..., the claim should not have been dismissed under Fed.R.Civ.P. 12(b)(6)."). Clearly, the Trustee can prove that the transfer of four pieces of gas equipment "sometime in 2000 or 2001" falls within one year of November 28, 2001.

The further specification that the transfer occurred when "Lear moved its business from DMC to DMW" telegraphs that DMW can look to its own records to determine whether it has a defense based on the one-year limitation in § 548(a). Con-

---

**10.** As explained above, the allegations in Count 1 of the First Amended Complaint and Exhibit A relate back to the date of the original Complaint before expiration of the limitation in § 546(a)-and thus it is the First Amended Complaint with Exhibit A that is properly considered for purposes of the Defendants' Motions to dismiss.

**11.** The Trustee does not allege any state-law based action for recovery of fraudulent conveyances under § 544.

trary to DMW's arguments, the complaint plainly alleges that the gas equipment was transferred for "no cash consideration."

The allegation in paragraph 34 of the First Amended Complaint that a lawsuit filed by DMC against TKA Corporation was assigned to DMW for no cash consideration one day before DMC filed bankruptcy states a claim under § 548(a). The precise date of this transfer is given. The lawsuit was property of DMC's estate and it is alleged that the lawsuit was assigned to DMW "for no cash consideration." The surrounding paragraphs of Count 1 allege asset transfers for no or insufficient consideration, when DMC or DMT was insolvent.

The claim in paragraph 32 of the First Amended Complaint that Buerger caused DMC to transfer $2,872,650 to DMW in 1999 fails to state a cause of action under § 548(a). Any transfer of assets of these debtors in 1999 occurred more than one year before the bankruptcy petition on November 28, 2001. No allegation is made that this 1999 transfer was concealed. *See Eisenberg v. Feiner (In re Ahead by a Length, Inc.)*, 100 B.R. 157, 163–64 (Bankr. S.D.N.Y.1989) ("To toll a federal statute of limitations pursuant to the fraudulent concealment doctrine, the plaintiff must establish (1) that the defendant concealed from him the existence of the claim, (2) that he remained in ignorance of that claim until some point within the applicable limitations period and (3) that his continuing ignorance was not attributable to lack of diligence on his part."). The 1999 transfer is not cognizable under § 548(a).

Exhibit A to the First Amended Complaint lists two cash payments from DMC to Buerger—$50,000 in December 2000, and $264,798 in 2001. These transfers could be fraudulent conveyances as described in Count 1 of the First Amended Complaint.[12]

Exhibit A lists 24 other payments from DMW to Defendant Buerger between (sometime in) 2001 and January 2004, totaling several million dollars. Some of these payments may have been made before DMC and DMT filed bankruptcy (before November 28, 2001); many of these payments by DMW are after the DMC and DMT petitions. Plaintiff alleges that the DMW payments in Exhibit A support its fraudulent conveyance causes of action because "DMC and DMT along with Defendant DMW were controlled and operated by Defendant Buerger as a single business enterprise." (Plaintiff's Expedited Motion at ¶ 6).

The payments by DMW in Exhibit A after November 28, 2001 cannot be fraudulent conveyances under § 548(a). Transfers avoidable under § 548(a)(1) must have occurred "on or within one year *before* ... the petition."[13]

Exhibit A to the First Amended Complaint lists payments totaling $341,017 by DMW to Buerger in "2001." Payments to Buerger by DMW between November 28, 2000 and November 28, 2001, could be fraudulent conveyances under § 548(a) if, *among other elements*, Plaintiff can prove that a payment by DMW was a transfer of "an interest of [DMC or DMT] in property."

Plaintiff's First Amended Complaint contains two theories to support the § 548(a) action with respect to payments

---

**12.** This assumes that the Plaintiff can prove that some or all of the $264,798 paid to Buerger by DMC in "2001" was paid before November 28 of that year—the date of the petitions.

**13.** There is no claim for recovery of postpetition transfers under § 549 in the First Amended Complaint.

by DMW to Buerger: (1) payments to Buerger by DMW were made with assets fraudulently conveyed to DMW by DMC or DMT; (2) DMC, DMT and DMW were a "single business enterprise," thus a transfer by DMW during the year before the petitions was a transfer of an interest of the debtors. The Plaintiff's fraudulent conveyance cause of action with respect to DMW's payments to Buerger is thus dependent on successful prosecution of one or both of these other claims.

11 U.S.C. § 550(a) contemplates that a transfer avoidable under § 548(a) may be recovered from the "initial transferee" (or beneficiary) or from an "immediate or mediate transferee of such initial transferee." In other words, if the Trustee successfully avoids a transfer by DMC or DMT to DMW as a fraudulent conveyance under § 548(a) and if there is further proof that assets fraudulently conveyed to DMW were further transferred (paid, for example) to Buerger by DMW, recovery from Buerger is authorized by § 550. *See, e.g., DuVoisin v. Kennerly, Montgomery, Howard & Finley (In re Southern Indus. Banking Corp.)*, 126 B.R. 294, 298–300 (E.D.Tenn.1991). Count 1 states a claim on which relief is available against Buerger for payments by DMW to the extent Buerger was the subsequent transferee of assets fraudulently conveyed to DMW by DMC or DMT.

As explained in detail below, the bankruptcy trustee lacks standing to bring an alter ego or single business enterprise action against DMW as alleged in Count 13. Accordingly, payments to Buerger by DMW are not recoverable under Count 1 based on the Plaintiff's single business enterprise theory.

In paragraph 37 of Count 2 (discussed below), Plaintiff states: "Among the assets of DMC transferred to DMW, and then transferred from DMW to Zanini, are the gas equipment described above, the computer equipment and related software listed on the attached PXA; and the patents listed on the attached PXB." Generously, it appears that Plaintiff intended the computer equipment, software and patents described in paragraph 37 of Count 2 to be included among the assets transferred from DMC to DMW in fraud of creditors for purposes of Count 1.

The computer equipment, software and patents are identified in detail in attachments to the First Amended Complaint. The cross-reference to the "gas equipment described above" in paragraph 37 provides a times reference ("sometime in 2000 or 2001") for transfer of computer equipment, software and patents. DMW is identified as the transferee—the same allegation found in Count 1 with respect to the gas equipment. The computer equipment, software and patents survive a motion to dismiss with respect to the § 548(a) action in Count 1.

As discussed above, Paragraphs 50, 51 and 52 of the First Amended Complaint list 15 transfers of cash by the Debtor within the year preceding bankruptcy to BBK, GM, JCI, CMD and DMW. In Count 6 of the First Amended Complaint, these transfers are alleged to be preferences under § 547.

In their answers and Motions to dismiss, several Defendants argue that the transfers listed in Paragraphs 50–52 cannot be preferences because they are unrelated to any antecedent debt for purposes of § 547(b). Plaintiff responds that if it is shown that these transfers by the debtor were not in payment of any debt, the named Defendants are on "fair notice" that Plaintiff will challenge these transfers as fraudulent conveyances under § 548. This is a common outcome in preference litigation—a successful defense that there was no antecedent debt for § 547(b)(2) pur-

poses generates the predicate for a fraudulent conveyance action under § 548. The facts alleged in paragraphs 50, 51 and 52 with respect to transfers of cash by the debtors during the year before bankruptcy can satisfy the specificity requirements for the fraudulent conveyance cause of action alleged in Count 1.

Finally, Count 12 together with paragraph 26 also allege conduct that falls within § 548. The debtors incurred debts within the year before bankruptcy for the benefit of the Controlling Customers, totaling $750,000. This money was paid to CF and CMD in connection with the Accommodation Agreement. Incurring debt for the benefit of the Controlling Customers can be a fraudulent conveyance under § 548(a)(1). CF, CMD and the Controlling Customers would be transferees and beneficiaries subject to liability under § 550(a)(1) and (2).

### B. Count 2

The turnover action against Defendant Zanini has been settled.

### C. Count 3

■■■ Count 3 is a demand for turnover under § 542.[14] Count 3 alleges that Buerger and DMW received $5.2 million from Defendant Zanini (when Zanini purchased assets from DMW after the bankruptcy petitions) which belongs "in whole or in part" to the bankruptcy estates of DMC and DMT.

The First Amended Complaint alleges that DMW was without value at the end of 1999 and that DMW came to have assets and valuable business interests only because the Defendants looted DMC and DMT by moving its assets and business operations into DMW. Counts 1, 2, 6 and 12 and Exhibit A specifically describe many transfers of assets from DMC and DMT to DMW that may have been fraudulent under § 548(a). 11 U.S.C. § 541(a)(3) includes in property of the estate, any interest in property the trustee recovers under § 550, which includes any recovery under § 548(a).

The complaint alleges that the assets sold by DMW to Zanini were property of the bankruptcy estates and that the trustee protested that sale in March of 2003. The Defendants' DMW and Buerger are reasonably on notice that the Plaintiff claims that all or part of the $5.2 million proceeds of the sale to Zanini are proceeds from the sale of the debtors' assets. Section 542 contemplates that a Defendant who disposes of estate property may be called to account for that property or the value of that property. Count 3 states a claim for which relief can be granted.

### D. Count 4

Count 4 seeks equitable subordination under § 510(c)(1)[15] of the claims of Defen-

---

14. 11 U.S.C. § 542(a) provides:

(a) Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

15. 11 U.S.C. § 510(c) provides:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

dants Buerger, DMW, GM, JCI, Lear, Bank One and GMAC. The First Amended Complaint does not allege that any named Defendant has filed a proof of claim in these bankruptcy cases.

Buerger asserts in his answer that in the event he is liable to the debtors for any reason, he is entitled to offsets and credits. GM states in its Answer and Affirmative Defenses to Count Six of the Trustee's First Amended Complaint that it "is entitled to an offset and or recoupment." Similarly, JCI asserts defensively that "Plaintiff's claims are barred, in whole or in part, because of recoupment and/or set-off."

■ These defensive pleadings are in the nature of claims and can be subject to equitable subordination. *See Commercial Fin. Servs., Inc. v. Bartmann (In re Commercial Fin. Servs., Inc.),* 255 B.R. 68 (Bankr.N.D.Okla.2000) (defense of setoff or indemnification in answers in adversary proceeding constitute claims for purposes of jury trial right.); *Gecker v. Mantelman (In re Mantelman),* Case No. 01 C 9915, 2002 WL 922087 (N.D.Ill.2002) (Setoff asserted in answer was "another way of making a claim against the estate[.]"). Count 4 alleges inequitable conduct by the named Defendants. Count 4 states a claim against the Defendants that assert rights of set off.

■ With respect to other Defendants, the cause of action for equitable subordination is dismissed for failure to allege a claim against the bankruptcy estates. Plaintiff argues that the deadline for filing proofs of claim has not yet passed and that some of the Defendants named in Count 4 have "reserved their rights to assert claims at a later date." Accordingly, dis-

missal of Count 4 is without prejudice to the Plaintiff's right to assert equitable subordination when or if any Defendant makes a claim against these bankruptcy estates. *Thistlethwaite v. FDIC (In re Pernie Bailey Drilling Co., Inc.),* 111 B.R. 565, 571 (Bankr.W.D.La.1990) ("[A]s a matter of law, there is no basis for equitable subordination because there is no claim to subordinate. If at some time in the future, it is shown that the FDIC does have an [*sic*] claim against the Debtor, the matter may be reconsidered.").

### E. Count 5 and Count 10

Counts 5 and 10 of the First Amended Complaint allege causes of action for breach of fiduciary duties and aiding and abetting breach of fiduciary duties against Buerger, GM, JCI, Lear, BBK and CMD. With respect to Buerger, the source of fiduciary duties to the debtors is that Buerger was the "100% owner and sole director of DMC and DMT." The other Defendants named in Count 5 are described as "control persons" that, after September 2000, "exerted sufficient influence and control over the affairs of Del-Met so as to constitute 'insiders' within the meaning of § 101(31) of the Bankruptcy Code, thereby owing those entities fiduciary duties."

■ The Bankruptcy Code does not impose "fiduciary duties" simply because an entity is an insider under § 101(31). *See, e.g., Wilson v. Huffman (In re Missionary Baptist Found. of Am.),* 818 F.2d 1135, 1144 (5th Cir.1987) ("We are not persuaded that the fact that one is deemed an 'insider' under the Bankruptcy Code necessarily means that one is a fiduciary."); *Boyd v. Sachs (In re Auto Special-*

---

(2) order that any lien securing such a subordinated claim be transferred to the

estate.

*ties Mfg. Co.)*, 153 B.R. 457, 478 n. 15 (Bankr.W.D.Mich.1993) (" 'insider' is statutorily defined in 11 U.S.C. § 101(31) and includes parties who may not be fiduciaries of the debtor at common law."). Fiduciary duties are imposed, if at all, by other state or federal law, not by § 101(31).

The Plaintiff cites no particular source of law for the assertion that Defendants (other than Buerger) owed fiduciary duties to the debtors.

Plaintiff's assertion of a "deepening insolvency" claim against the Defendants named in Counts 5 and 10 further obscures the source of fiduciary duties. In her brief, the trustee states, "Plaintiff has asserted a 'deepening insolvency' claim, not as an independent tort, but as part of the defendants' breach of fiduciary duties." (Plaint. Amended Resp. at 27.) At oral argument, counsel for the trustee reiterated that deepening insolvency was alleged as a breach of fiduciary duty by the Defendants, not as an independent tort.

Stopping there, the tough question would remain: What is the source of law for the fiduciary duties that the Defendants are alleged to have breached by deepening the insolvency of the debtors? But the Plaintiff didn't stop with its disclaimer of an "independent tort" of deepening insolvency. Instead, the Trustee states in her brief on these Motions to dismiss:

> While the issue of duty is a question of law, there are no Tennessee cases which have specifically accepted or rejected that duty. Like the courts in *Lafferty*, 267 F.3d at 349–52, and *In re Exide Technologies, Inc.*, 299 B.R. 732, 750–52 (Bankr.D.Del.2003), and for the reasons articulated by those courts, this court should likewise acknowledge the viability of the deepening insolvency theory under Tennessee law.

In *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340 (3d Cir.2001), and *Official Committee of Unsecured Creditors v. Credit Suisse First Boston, (In re Exide Technologies, Inc.)*, 299 B.R. 732 (Bankr.D.Del.2003), the Third Circuit and the Delaware bankruptcy court—applying Pennsylvania and Delaware law—recognized tort actions for "deepening insolvency" against Defendants who were not all in fiduciary relationships with the debtor corporations by virtue of officer or director status. Here, the Plaintiff eschews reliance on any independent tort of deepening insolvency; invites the court to find that Tennessee would recognize such an action; and then uses deepening insolvency as a breach of fiduciary duty by Defendants not alleged to have fiduciary duties to the debtors under any identified legal theory other than deepening insolvency itself.

These circular positions by the trustee speak volumes to the lack of definition of the developing theory of deepening insolvency. *See generally* Jo Ann J. Brighton, *Deepening Insolvency*, 23–3 AM. BANKR. INST. J. 34 (2004); Paul Rubin, *New Liability Under "Deepening Insolvency,"* 23–3 AM. BANKR. INST. J. 50 (2004); Allen Michel & Israel Shaked, *Deepening Insolvency: Plaintiff vs. Defendant*, 21–5 AM. BANKR. INST. J. 32 (2002).

> [S]ince the theory of deepening insolvency is not well defined or universally embraced by all courts, and with few written opinions concerning the topic, creativity in the use of the theory abounds. The theory has expanded beyond the realm of officers and directors and has been successfully raised against insolvency professionals, such as accountants, investment brokers and lawyers . . . . Secured lenders may also be liable for deepening the insolvency of a company based on their agreement to continue to lend.

*Deepening Insolvency*, 23–3 AM. BANKR. INST. J. at 34.

▮ Whether characterized as a separate tort or as an example of a breach of fiduciary duty, the Trustee's deepening insolvency claim is cognizable only if the Defendants owed duties to the debtor corporations under nonbankruptcy law by virtue of their domination and control such that the run up of debt, the performance of unprofitable contracts, the selective payment of vendors and other allegations in the complaint are actionable breaches.

This returns us to the question of choice of law: To the law of what state do we look to determine whether a duty arose in the Defendants with respect to the deepening insolvency of these debtors? The parties stipulated that Tennessee law applies to Count 5 and to Count 10. This suggests that the parties conceive of deepening insolvency as a tort independent of issues of corporate governance.[16] This is not obvious.

Buerger was an officer, director and sole shareholder of both debtor corporations. As explained above, his fiduciary duties to the debtors arose under New York corporation law with respect to DMC and under Delaware corporation law for DMT. To the extent the deepening insolvency action alleged in Counts 5 and 10 is based on a breach of duty arising from Buerger's fiduciary duties as a corporate officer or director, that cause of action is governed by New York or Delaware law, not Tennessee law. Different analysis applies to the extent the deepening insolvency claims are based on duties arising outside of corporate governance.

The Defendants (other than Buerger) named in Counts 5 and 10 are customers of the debtors and agents of those customers alleged to have taken over the management and control of the debtors far in excess of the ordinary influence of customers on a supplier. Several of these Defendants are alleged to have advanced money on behalf of the debtors and to have acquired lien positions in the debtors' assets in furtherance of their control and use of the debtors. The theoretical foundation for Plaintiff's claims that these facts give rise to breachable duties roots less in corporate law than in general tort notions of a duty arising from a special relationship created by a course of dealings that includes unequal bargaining power, overreaching and abuse of the less equal party.

The trustee's citations to *Lafferty* and *Exide* support the view that the deepening insolvency alleged with respect to defendants other than Buerger is a creature of tort law. In *Lafferty*, the Third Circuit reviewed Pennsylvania tort law to conclude that deepening insolvency was a sound legal theory. *Lafferty*, 267 F.3d at 349–50. The bankruptcy court in *Exide* finds an independent tort of deepening insolvency under Delaware law. *In re Exide Techs., Inc.*, 299 B.R. at 751–52. These courts did not find deepening insolvency in corporation law but instead found breachable duties arising from domination and control of the corporate debtors by the defendants.

Although the issue is not free from doubt, for purposes of this adversary proceeding, the claims of deepening insolvency in Counts 5 and 10 against Defendants other than Buerger will be treated as tort claims. Tennessee law—the "situs" of the alleged events—will be consulted to determine whether these claims are viable.

---

**16.** Remember that DMC and DMT were incorporated in New York and Delaware, respectively.

Count 5 states that Buerger owed fiduciary duties to DMC and DMT based on his 100% ownership of the debtor corporations and his position as sole director. In contrast, Count 10 more generally states that Buerger owed fiduciary duties to DMC and DMT based on all the allegations in the First Amended Complaint. The cause of action against Buerger in Count 10 is thus more like the torts alleged against other Defendants in Counts 5 and 10. To the extent Count 10 alleges that deepening insolvency is a breach by Buerger of fiduciary duties arising independently of his positions in the corporate governance of the debtors, the cause of action would be measured under Tennessee law.

### Fiduciary Duties

Under Delaware, New York and Tennessee law it is textbook that officers and directors owe fiduciary duties to the corporation. *See, e.g.,* DEL. CODE ANN. tit. 8, §§ 141 & 142; N.Y. BUS. CORP. §§ 701, 713, 715, 717 & 720; TENN. CODE ANN. § 48–18–203, 48–18–301 & 48–18–403. Defendant Buerger owed the Debtors fiduciary duties under New York and Delaware law of good faith, loyalty and due care, and was charged with an unyielding fiduciary duty to protect the interests of the corporation. *See, e.g., Patrick v. Allen,* 355 F.Supp.2d 704 (S.D.N.Y.2005); *Production Res. Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772 (Del.Ch.2004); *Hollinger Int'l, Inc. v. Black,* 844 A.2d 1022 (Del.Ch.2004); *see also Croton River Club, Inc. v. Half Moon Bay Homeowners Ass'n, Inc. (In re Croton River Club, Inc.),* 52 F.3d 41, 44 (2d Cir.1995).

Plaintiff alleges that Buerger breached fiduciary duties in many ways including self-dealing in the assets of the debtor corporations, the fraudulent conveyance of corporate assets and opportunities, abdicating responsibility for the finances,

management and operations of the corporations, unauthorized payments and transfers to himself and others that injured the corporations and disregard of the separate identities of the corporations. These allegations are sufficient to state causes of action against Buerger for breach of fiduciary duties under New York and Delaware law.

New York and Delaware have well developed case law that addresses fiduciary relationships more broadly—involving majority or controlling shareholders, lenders and other parties exercising control of a corporation. Under Delaware law, it is well established that a party need not be a director or officer in order to owe fiduciary duties to a corporation. A fiduciary duty may arise from the exercise of control with respect to the corporation. "It is only when a person affirmatively undertakes to dictate the destiny of the corporation that he assumes such a fiduciary duty.'" *Harriman v. E.I. DuPont De Nemours & Co.,* 372 F.Supp. 101, 105–06 (D.Del.1974) (citing *Allied Chemical & Dye Corp. v. Steel & Tube Co.,* 120 A. 486 (Del. Ch.1923)). *See also Brickman v. Tyco Toys, Inc.,* 731 F.Supp. 101, 107 (S.D.N.Y.1990) (interpreting Delaware law). New York courts have interpreted New York law similarly. *See, e.g., New York State Med. Care Facilities Agency v. Bank of Tokyo Trust Co.,* 163 Misc.2d 551, 621 N.Y.S.2d 466 (N.Y.Sup.Ct.1994) ("Under New York Law, 'a fiduciary relationship exists from the assumption of control and responsibility[.]' ") (quoting *Beneficial Commercial Corp. v. Murray Glick Datsun, Inc.,* 601 F.Supp. 770, 772 (S.D.N.Y. 1985) (citing *Gordon v. Bialystoker Center & Bikur Cholim, Inc.,* 45 N.Y.2d 692, 412 N.Y.S.2d 593, 385 N.E.2d 285 (1978))).

Tennessee corporation law does not list "control persons" or "insiders" as individuals that owe fiduciary duties to a corpora-

tion. *See, e.g.,* TENN. CODE ANN. §§ 48–18–203; 48–18–301; 48–18–403; 35–2–102 (defining fiduciary under the Uniform Fiduciaries Act); *Nelson v. Martin,* 958 S.W.2d 643 (Tenn.1997), *overruled on other grounds, Trau–Med. of Am., Inc. v. Allstate Ins. Co.,* 71 S.W.3d 691 (Tenn.2002). Plaintiff's citation to *McLemore v. Olson (In re B & L Laboratories, Inc.),* 62 B.R. 494 (Bankr.M.D.Tenn.1986), is not helpful: *B & L* analyzed fiduciary duties owed by defendants who were corporate officers or directors or general partners—relationships recognized by nonbankruptcy law to generate fiduciary duties. There is no claim that any Defendant named in Counts 5 or 10 other than Buerger was an officer, director or partner of the Debtors.

█ Tennessee courts have long recognized a common law fiduciary relationship between majority or controlling shareholders of a corporation and minority shareholders. *See, e.g., Mike v. Po Group, Inc.,* 937 S.W.2d 790, 793 (Tenn.1996); *Nelms v. Weaver,* 681 S.W.2d 547, 549 (Tenn.1984); *Dale v. Thomas H. Temple Co.,* 186 Tenn. 69, 208 S.W.2d 344, 352 (1948). Tennessee courts acknowledge that the fiduciary duties of majority or controlling shareholders are not based on the Tennessee corporation statutes but arises from more general tort law notions of duty attendant to the exercise of dominion or control. In *Po Group,* the Tennessee Supreme Court looked to tort law, and rejected Tennessee corporation law, for the statute of limitations with respect to an action against majority shareholders for breach of fiduciary duties. The Tennessee Supreme Court stated: "Other jurisdictions which have considered the limitations period applicable to actions by minority shareholders against majority shareholders alleging breach of fiduciary duty have held that such actions are governed by the statute of limitations for tortious injury to proper-

ty.... There is a 'growing common law trend to declare that a breach of fiduciary duty is a tort.'" *Mike v. Po Group,* 937 S.W.2d at 795 (citations omitted).

In *Intertherm, Inc. v. Olympic Homes Systems, Inc.,* 569 S.W.2d 467 (Tenn.Ct. App.1978), the Court of Appeals of Tennessee explained that a shareholder becomes a fiduciary to a Tennessee corporation—and is subject to the special rule of scrutiny of transactions with the corporation—by exercising dominion or control over the affairs of the corporation:

[C]ourts will closely scrutinize the transactions of a majority, dominant, or controlling shareholder with is corporation .... [T]he reason for applying the rule to a shareholder is the same as the reason for applying it to an officer or director, that is, that he occupies a fiduciary position with regard to the corporation .... Unless it is shown that a shareholder owns a majority of the stock or that he otherwise controls or dominates a corporation, however, a shareholder cannot be said to be a fiduciary and the reason for closely scrutinizing his transactions with the corporation disappears.... [C]ourts should apply the rule of close scrutiny ... when the shareholder owns a majority of stock, or is shown to dominate or control the corporation to a significant degree in some other way.

*Intertherm, Inc. v. Olympic Homes Systems, Inc.,* 569 S.W.2d at 471–73. *Accord Johns v. Caldwell,* 601 S.W.2d 37 (Tenn.Ct. App.1980) (control and domination other than by way of majority stock ownership is one source of fiduciary duties among shareholders); *Security Bank & Trust Co. v. Nelms,* 1986 WL 7813, at *4 (Tenn.Ct. App. July 14, 1986) (Shareholder did not occupy a fiduciary relationship with corporation because shareholder "did not own a majority of the stock ... it cannot be said

that he 'otherwise controls or dominates' the [corporation].'"). *See also Anderson v. Wilder*, No. E2003–00460–COA–R3CV, 2003 WL 22768666 (Tenn.Ct.App. Nov.21, 2003) (Controlling members of a Tennessee LLC owe fiduciary duties to minority members notwithstanding that Tennessee LLC statute only creates fiduciary duties of members to the LLC.).

Looking beyond the immediate corporate family, the Court of Appeals of Tennessee has acknowledged the possibility that breachable duties can arise in the context of a lending relationship when special facts or circumstances are present. For example, in *Oak Ridge Precision Industries, Inc. v. First Tennessee Bank N.A.*, 835 S.W.2d 25 (Tenn.Ct.App.1992), the court of appeals rejected a borrower's claim for breach of fiduciary duties by a lender but had this to say about the cause of action under Tennessee law:

> Although fiduciary relationships may arise whenever confidence is reposed by one party in another who exercises dominion and influence, the dealings between a lender and a borrower are not inherently fiduciary absent special facts and circumstances.

*Id.* at 30. *See also Lipman v. First Nat'l Bank of Boston*, No. 01A01–9803–CH–00139, 1999 WL 51875 (Tenn.Ct.App. Feb.5, 1999) (Court found insufficient proof to support action by a limited partner against bank alleging civil conspiracy and inducing breach of fiduciary duties through control of the general partner in a business partnership.).

In *Scott v. East Tennessee Production Credit Association of Greeneville*, C.A. No. 1106, 1987 WL 17244, at *4 (Tenn.Ct.App. Sept. 23, 1987), the Court of Appeals of Tennessee cites its earlier unpublished opinion in *Conley v. C.A. Rawls*, for the proposition that in the "extreme fact situation . . . a fiduciary duty existed" between a lender and a borrower. The courts of many states on various theories of contract and tort have recognized that breachable duties to a corporation can arise in a lender that exercises unreasonable or excessive control over its borrower.[17]

 No Tennessee Supreme Court decision has been found directly embracing or rejecting the possibility that Tennessee law would recognize fiduciary duties in a party other than a shareholder, officer or director that exercises dominion or control over a corporation. But the Tennessee cases cited above demonstrate that, on unusual facts, the exercise of domination or control in the context of a business relationship by a party not otherwise a fiduciary can give rise to fiduciary duties under Tennessee law.

The Plaintiff in this adversary proceeding has alleged special facts and extreme circumstances in the seizure of management and control of the debtors by the Controlling Customers, BBK and CMD. The imposition of the Accommodation Agreement, manipulation of the debt structure of the Debtors, operation of the Debtors by strangers to the corporate governance structure for the benefit of the Controlling Customers are extreme facts that this court believes would support a cause of action for breach of fiduciary duties under Tennessee law.

### Deepening Insolvency

Deepening insolvency was first recognized as a theory for recovery in actions

---

17. *See generally* William N. Medlock, *Stemming the Tide of Lender Liability: Judicial and Legislative Reactions*, 67 Denv. U.L. Rev. 453 (1990); Jeffrey John Hass, *Insights into Lender Liability: An Argument for Treating Controlling Creditors as Controlling Shareholder*, 135 U. Pa. L. Rev. 1321 (1987); K. Thor Lundgren, *Liability of a Creditor in a Control Relationship with its Debtor*, 67 Marq. L. Rev. 523 (1984).

for breach of fiduciary duty alleging that officers or directors deepened the insolvency of the corporation and reduced or eliminated any return for creditors. *See generally Deepening Insolvency*, 23–4 Am. Bankr. Inst. J. at 34 & n. 2 (citing *Smith v. Arthur Andersen*, 175 F.Supp.2d 1180 (D.Ariz.2001)). Its origin has been traced to *Bloor v. Dansker (In re Investors Funding Corp. of New York Securities Litigation)*, 523 F.Supp. 533 (S.D.N.Y. 1980). *Kittay v. Atlantic Bank of New York (In re Global Serv. Group LLC)*, 316 B.R. 451, 456 (Bankr.S.D.N.Y.2004).

"[T]he deepening insolvency theory of liability holds that there are times when a defendant's conduct, either fraudulently or even negligently, prolongs the life of a corporation, thereby increasing the corporation's debt and exposure to creditors." *Deepening Insolvency*, 23–4 Am. Bankr. Inst. J. at 34. The action has morphed, both in form—from a breach of statutory duty claim to a form of common law tort liability—and in scope—now reaching lawyers, accountants, bankers and other financial and insolvency professionals. *See Id.* at 34. (citing cases). As recounted by the bankruptcy court in *In re Global Service Group LLC*:

> Since *Investors Funding*, several courts have accepted the theory that an insolvent corporation suffers a distinct and compensable injury when it continues to operate and incur more debt. Some have treated "deepening insolvency" as an independent cause of action. *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 349–52 (3d Cir.2001)(construing Pennsylvania law); *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.)*, 299 B.R. 732, 750–52 (Bankr.D.Del.2003) (construing Delaware law). Other courts have viewed it as a theory of damages, often raised in response to the defense that increased debt injured the creditors, but did not harm (and actually helped) the corporation. *Schacht [v. Brown]*, 711 F.2d [1343] at 1350 [(7th Cir.1983)]; *Hannover Corp. of America v. Beckner*, 211 B.R. 849, 854 (M.D.La.1997); *Allard v. Arthur Andersen & Co. (USA)*, 924 F.Supp. 488, 494 (S.D.N.Y.1996); *Drabkin v. L & L Constr. Assocs., Inc. (In re Latin Inv. Corp.)*, 168 B.R. 1, 6 (Bankr. D.C.1993). Finally, some courts have rejected the theory outright, *Coroles v. Sabey*, 79 P.3d 974, 983 (Utah Ct.App. 2003) (rejecting "deepening insolvency" as a theory of damages because shareholders rather than the corporation suffer harm), or raised serious questions about its viability. *See Florida Dep't of Ins. v. Chase Bank of Texas Nat'l Ass'n*, 274 F.3d 924, 935–36 (5th Cir.2001) (questioning whether Texas recognizes the cause of action, but even if it did, concluding that the defendant was entitled to summary judgment because the plaintiff failed to quantify the additional debt or provide evidence of damages that might be compensable under the "deepening insolvency" theory); *Askanase v. Fatjo*, No. Civ. A. H–91–3140, 1996 WL 33373364, at *28 (S.D.Tex. Apr.1, 1996) (rejecting trustee's "deepening insolvency" argument because the insolvent debtor was not damaged by false financial statements since the shareholders had already lost all of their equity and the complaint did not allege that any creditor was injured); *Feltman v. Prudential Bache Sec.*, 122 B.R. 466, 473–74 (S.D.Fla.1990) (rejecting argument that insolvent corporation was harmed by artificial extension of its life where complaint alleged that corporation was a sham, without a corporate identity and served as a conduit for stolen money).

> . . . .

The distinction between "deepening insolvency" as a tort or damage theory may be one unnecessary to make. Prolonging an insolvent corporation's life, without more, will not result in liability under either approach. Instead, one seeking to recover for "deepening insolvency" must show that the defendant prolonged the company's life in breach of a separate duty, or committed an actionable tort that contributed to the continued operation of a corporation and its increased debt. *E.g., R.F. Lafferty & Co.,* 267 F.3d at 345, 349 (defendants used fraudulent financial statements to raise capital in the debtor's name, thereby deepening debtor's insolvency and causing bankruptcy); *Schacht,* 711 F.2d at 1350 (parent company and directors continued to operate insolvent company by fraudulently concealing the company's insolvency); *Allard,* 924 F.Supp. at 494 (fraud by debtor's accountant led to continued operations and increased debt); *In re Gouiran Holdings, Inc.,* 165 B.R. at 107 (negligent preparation of financial statements may have caused debtor to incur unmanageable debt and file for bankruptcy); *In re Exide Techs., Inc.,* 299 B.R. at 750–52 (recognizing "deepening insolvency" cause of action against lender who had obtained control of the debtor and used its control to prolong the debtor's life for two years and to force it to enter into transactions or delay a bankruptcy filing in order to favor the lender at the expense of the debtor); *Tabas v. Greenleaf Ventures, Inc. (In re Flagship Healthcare, Inc.),* 269 B.R. 721, 728–29 (Bankr.S.D.Fla. 2001) (negligently prepared valuation report induced corporation to continue to make corporate acquisitions and borrow additional funds, and resulted in financial deterioration); *In re Latin Inv. Corp.,* 168 B.R. at 6 (concluding that the trustee had standing to sue for injuries to the debtor based on the allegations that the defendants perpetuated the business past the point of insolvency in order to loot it).

*In re Global Serv. Group, LLC,* 316 B.R. at 456–59.

No Tennessee decision has been found addressing deepening insolvency. This court must determine, as did the Third Circuit in *Lafferty* (looking to Pennsylvania law), whether the Tennessee Supreme Court would recognize deepening insolvency as an actionable breach of duty.

In *Lafferty* the court considered three factors: (1) soundness of the theory, (2) growing acceptance of the theory among courts and (3) the remedial theme in Pennsylvania law. The Third Circuit's reasoning deserves extended quotation:

> First and foremost, the theory is essentially sound.... Even when a corporation is insolvent, its corporate property may have value. The fraudulent and concealed incurrence of debt can damage that value in several ways. For example, to the extent that bankruptcy is not already a certainty, the incurrence of debt can force an insolvent corporation into bankruptcy, thus inflicting legal and administrative costs on the corporation. *See* Richard A. Brealey & Stewart C. Myers, *Principles of Corporate Finance* 487 (5th ed. 1996) ("[B]y issuing risky debt,[a corporation] give[s] lawyers and the court system a claim on the firm if it defaults."). When brought on by unwieldy debt, bankruptcy also creates operational limitations which hurt a corporation's ability to run its business in a profitable manner. *See id.* at 488–89. Aside from causing actual bankruptcy, deepening insolvency can undermine a corporation's relationships with its customers, suppliers, and employees. The very threat of bankruptcy, brought about through fraudulent debt, can

shake the confidence of parties dealing with the corporation, calling into question its ability to perform, thereby damaging the corporation's assets, the value of which often depends on the performance of other parties. *See* Michael S. Knoll, *Taxing Prometheus: How the Corporate Interest Deduction Discourages Innovation and Risk–Taking,* 38 VILL. L. REV. 1461, 1479–80 (1993). In addition, prolonging an insolvent corporation's life through bad debt may simply cause the dissipation of corporate assets.

These harms can be averted, and the value within an insolvent corporation salvaged, if the corporation is dissolved in a timely manner, rather than kept afloat with spurious debt. As the Seventh Circuit explained in *Schacht v. Brown:*

> [C]ases [that oppose "deepening insolvency"] rest[ ] upon a seriously flawed assumption, i.e., that the fraudulent prolongation of a corporation's life beyond insolvency is automatically to be considered a benefit to the corporation's interests. This premise collides with common sense, for *the corporate body is ineluctably damaged by the deepening of its insolvency, through increased exposure to creditor liability. Indeed, in most cases, it would be crucial that the insolvency of the corporation be disclosed, so that shareholders may exercise their right to dissolve the corporation in order to cut their losses.* Thus, acceptance of a rule which would bar a corporation from recovering damages due to the hiding of information concerning its insolvency would create perverse incentives for wrong-doing officers and directors to conceal the true financial condition of the corporation from the corporate body as long as possible.

711 F.2d 1343, 1350 (7th Cir.1983) (citations omitted) (emphasis added).

Growing acceptance of the deepening insolvency theory confirms its soundness. In recent years, a number of federal courts have held that "deepening insolvency" may give rise to a cognizable injury to corporate debtors. *See, e.g., id.* (applying Illinois law and holding that, where a debtor corporation was fraudulently continued in business past the point of insolvency, the liquidator had standing to maintain a civil action under racketeering law); *Hannover Corp. of America v. Beckner,* 211 B.R. 849, 854–55 (M.D.La.1997) (applying Louisiana law and stating that "a corporation can suffer injury from fraudulently extended life, dissipation of assets, or increased insolvency"); *Allard v. Arthur Andersen & Co.,* 924 F.Supp. 488, 494 (S.D.N.Y.1996) (applying New York law and stating that, as to suit brought by bankruptcy trustee, "[b]ecause courts have permitted recovery under the 'deepening insolvency' theory, [defendant] is not entitled to summary judgment as to whatever portion of the claim for relief represents damages flowing from indebtedness to trade creditors"); *In re Gouiran Holdings, Inc.,* 165 B.R. 104, 107 (E.D.N.Y.1994) (applying New York law, and refusing to dismiss claims brought by a creditors' committee because it was possible that, "under some set of facts two years of negligently prepared financial statements could have been a substantial cause of [the debtor] incurring unmanageable debt and filing for bankruptcy protection"); *Feltman v. Prudential Bache Securities,* 122 B.R. 466, 473 (S.D.Fla.1990) (stating that an " 'artificial and fraudulently prolonged life ... and ... consequent dissipation of assets' constitutes a recognized injury for which a corporation can sue under certain conditions", but concluding that

there was no injury on the facts). Some state courts have also recognized the deepening insolvency theory. *See, e.g., Herbert H. Post & Co. v. Sidney Bitterman, Inc.*, 219 A.D.2d 214, 639 N.Y.S.2d 329 (N.Y.App. Div. 1st Dep't 1996) (applying New York law and allowing a malpractice claim for failing to detect embezzlement that weakened a company, which already was operating at a loss, thereby causing default on loans and forcing liquidation); *Corcoran v. Frank B. Hall & Co.*, 149 A.D.2d 165, 175, 545 N.Y.S.2d 278 (N.Y.App. Div. 1st Dep't 1989) (applying New York law and allowing claims for causing a company to "assume additional risks and thereby increase the extent of its exposure to creditors").

*Lafferty*, 267 F.3d at 349–51. Finally, the court noted, "one of the most venerable principles of Pennsylvania jurisprudence, and in most common law jurisdictions for that matter is that, where there is an injury, the law provides a remedy." *Id.* at 351.

■■■ The analysis in *Lafferty* is sound. As to the third factor, the Tennessee Supreme Court has adopted the same jurisprudential principle as the Pennsylvania high court: where there is a tortious injury, the law will provide a remedy. *See, e.g., McFarlane v. Moore*, 1 Tenn. 174 (1805) ("By the principles of the common law, there can be no injury without a correspondent remedy."). This court concludes that if presented with compelling facts, the Tennessee Supreme Court would recognize deepening insolvency as an actionable breach of duty to a corporation.

■■■ Against this backdrop, Plaintiff's deepening insolvency claims survive these Motions to dismiss. As to Defendants named in Counts 5 and 10 other than Buerger, Plaintiff alleges they deepened the insolvency of the debtors by taking over the finances, management and operations of the debtors for the purpose of supplying GM, Lear and JCI with products and services that were prohibitively unprofitable for the Debtors. Management was inserted from outside in the form of BBK and CMD. Creditors were paid selectively and enormous debts were incurred solely for the benefit of the Controlling Customers. Corporate assets were dissipated without regard to the interests of the corporations. The viability of DMC and DMT was utterly destroyed by the Defendants. The corporations' abilities to provide products and services to customers other than the Controlling Customers was destroyed. The corporations' debts were profoundly inflated without regard to the best interests of the corporations. Defendants' domination and control of the debtors gave rise to duties; deepening the insolvency of the debtors for the benefit of the Controlling Customers was an actionable breach.

■■■ The courts of both New York and Delaware have recognized that deepening insolvency can be a breach of the fiduciary duties owed to a corporation by its officers and directors. *See In re Global Serv. Group, LLC*, 316 B.R. 451 (Bankr.S.D.N.Y. 2004) (*citing Bloor v. Dansker (In re Investors Funding Corp. of N.Y. Sec. Litig.)*, 523 F.Supp. 533 (S.D.N.Y.1980)); *In re Exide Techs., Inc.*, 299 B.R. 732 (Bankr. D.Del.2003). For all the reasons stated above, the First Amended Complaint alleges a cause of action against Buerger for deepening the insolvency of the debtors.

### Aiding and Abetting a Breach of Fiduciary Duty

Counts 5 and 10 allege that GM, JCI, Lear, BBK and CMD aided and abetted Buerger's breach of fiduciary duties owed to DMC and DMT.

New York, Delaware and Tennessee each recognize an action for aiding and abetting a breach of fiduciary duty. *See, e.g., Gilbert v. El Paso Co.,* 490 A.2d 1050, 1057 (Del.Ch.1984) ("It is well settled that a third party who knowingly participates in the breach of a fiduciary's duty becomes liable to the beneficiaries of the trust relationship.") (citing *Jackson v. Smith,* 254 U.S. 586, 589, 41 S.Ct. 200, 201, 65 L.Ed. 418 (1921); *Laventhol, Krekstein, Horwath & Horwath v. Tuckman,* 372 A.2d 168, 170 (Del. Ch.1976); *Penn Mart Realty Co. v. Becker,* 298 A.2d 349, 351 (Del.Ch.1972)); *Sharp Int'l Corp. v. State Street Bank & Trust Co.,* 302 B.R. 760, 769–770 (E.D.N.Y. 2003) ("The cause of action for aiding and abetting a breach of fiduciary duty under New York common law is based on the well-established principle that '[a]nyone who *knowingly participates* with a fiduciary in a breach of trust is liable for the full amount of the damage caused thereby to the cestuis que trust.'") (*quoting Wechsler v. Bowman,* 285 N.Y. 284, 34 N.E.2d 322, 326 (1941)); *Lawyers Title Ins. Corp. v. United Am. Bank of Memphis,* 21 F.Supp.2d 785, (W.D.Tenn.1998) ("Tennessee has adopted the Restatement of Torts § 876(b) theory of aiding and abetting, under which the plaintiff must show that 'the defendant knew that his companions' conduct constituted a breach of duty, and that he gave substantial assistance or encouragement to them in their acts.' ... Under this theory of aiding and abetting, 'an individual who participates in an unlawful activity in concert with others is liable for any damages resulting from acts committed by his compatriots in the course of that activity.' ... [T]he defendant need not owe a duty to the plaintiff, but rather, must know that a third party owes a duty to the plaintiff.") (citing *Cecil v. Hardin,* 575 S.W.2d 268 (Tenn.1978)); *Hayes v. Schweikart's Upholstering Co.,* 402 S.W.2d 472, 478 (Tenn.Ct.App.1965) (Court recognizes a cause of action for damages against a third party who "knowingly participates with the officers of a corporation in the commission of an act which manifests bad faith or a breach of duty to said corporation."); *Holmes Fin. Assocs., Inc. v. Jones,* Case No. 02A01–9104CH00071, 1991 WL 268370, at *9 (Tenn.Ct.App. Dec.18, 1991) (Citing *Hayes,* court concludes that complaint states a cause of action "for damages for knowingly participating with the director, officer, and majority shareholder ... in the commission of a breach of duty owed to the corporation which damages the corporation."). *See generally* RESTATEMENT (FIRST) TORTS § 876 (1939 & 2004 Supp.) ("For harm resulting to a third person from the tortious conduct of another, a person is liable if he ... (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person."); Wirum, Baer & Africa, *Corporate Governance and Fiduciary Duties to Creditors of Insolvent Corporations,* 849 PLI/COMM. 1183 (2003).

Aiding and abetting breach of fiduciary duties requires "a showing that there (1) existed a fiduciary relationship, (2) was a breach of the fiduciary's duty, (3) was a knowing participation in the breach by a defendant who is not a fiduciary and (4) that damages are proximately caused by the breach." Jo Ann J. Brighton, *Secured Creditors Beware: The Latest Tool in the Creditor's Committee Toolbox Aiding and Abetting in the Breach of a Fiduciary Duty,* 23–10 AM. BANKR. INST. J. 36 & n. 8 (2004); *see also In re Exide Techs., Inc.,* 299 B.R. at 749 ("[T]o state a claim for aiding and abetting a breach of fiducia-

ry duty, the plaintiffs must plead four elements: (I) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) a knowing participation in the breach by a defendant who is not a fiduciary, and (iv) damages are proximately caused by the breach.") (*citing Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del.2001)).

■ As demonstrated above, Buerger owed fiduciary duties to the debtor corporations under Delaware and New York law. The First Amended Complaint alleges facts sufficient to constitute a cause of action against Buerger for multiple breaches of those duties, including the claim that Buerger deepened the insolvency of the Debtors.

The First Amended Complaint alleges that the Controlling Customers directly participated with Buerger in some of the conduct that would constitute a breach of duty by Buerger. For example, the Controlling Customers engineered the Accommodation Agreement to which Buerger was a party and which is alleged to be an instrument by which GM, JCI and Lear solidified their control of the Debtors— control that Buerger was duty bound to maintain by virtue of his corporate offices. The Controlling Customers are alleged to have participated with Buerger in the looting of assets from DMC and DMT and the fraudulent transfers of assets and business opportunities to DMW and ultimately to Zanini. The Controlling Customers are alleged to have participated with Buerger in deepening the insolvency of the Debtors by fraudulently expanding the debts of the Debtors, selectively paying venders and prolonging the lives of the Debtors for the benefit of the Controlling Customers, leaving corporate shells without assets, business opportunities or any ability to carry out corporate goals or to repay creditors.

BBK and CMD are alleged to have taken over the management and operations of the Debtor—responsibilities that were Buerger's by statute. BBK and CMD then managed and operated the Debtors for the benefit of the Controlling Customers and at great damage to the debtor corporations. Tremendous losses were generated for the Debtors by BBK and CMD through selective payment of suppliers and the performance of highly unprofitable contracts for the benefit of the Controlling Customers. It is alleged that BBK and CMD were paid by the Debtors for their mismanagement of the Debtors— on Buerger's watch as sole director of both corporations.

All the elements of aiding and abetting breach of fiduciary duty are stated with respect to the Defendants named in Counts 5 and 10.

**Standing and *In Pari Delicto***

*Standing*

■ Some Defendants challenge the trustee's standing to bring actions for breach of fiduciary duty and aiding and abetting breach of fiduciary duty on the ground that these actions belong to creditors and cannot be pursued by the trustee on behalf of the corporations. Defendants also challenging standing with respect to Counts 5 and 10 on the basis of the defense of *in pari delicto.*

■ *In pari delicto* is a defense to an action in tort, not a basis upon which to challenge standing to sue. *Terlecky v. Hurd (In re Dublin Sec., Inc.)*, 133 F.3d 377 (6th Cir.1997); *see also Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 157 (2d Cir.2003) (" 'That the defendant may have a valid defense [i.e., *in pari delicto*] on the merits of a claim brought by the debtor goes to the resolution of the claim, and not to the ability of the debtor to assert the claim.' ").

Actions for breach of fiduciary duties and for aiding and abetting breach of fiduciary duties—in contrast to an action to disregard corporate identity [18]—accrue to the corporation itself because fiduciary duties are owed to the corporation and it is the corporation that suffers injury when fiduciary duties are breached. *See, e.g., Pepper v. Litton,* 308 U.S. 295, 307, 60 S.Ct. 238, 84 L.Ed. 281 (1939) ("While normally that fiduciary obligation is enforceable directly by the corporation, or through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by the trustee."); *Keene Corp. v. Coleman (In re Keene Corp.),* 164 B.R. 844, 853–54 (Bankr. S.D.N.Y.1994) ("Claims based upon breach of a fiduciary duty belong to a corporation, but once bankruptcy ensues, they are enforceable by the trustee.... The trustee, therefore, is the only person with standing to bring those claims ... [and] the creditors are barred from asserting them"); *Production Res. Group, L.L.C. v. NCT Group, Inc.,* 863 A.2d 772 (Del.Ch.2004); *Glenn v. Hoteltron Sys., Inc.,* 74 N.Y.2d 386, 547 N.Y.S.2d 816, 547 N.E.2d 71, 73–5 (1989) (recovery of corporate property improperly used for the benefit of a corporate officer/shareholder in violation of his fiduciary duties is a claim of the corporation, and any recovery must go to the corporation); *Brown v. Vencap Inv. Corp.,* 1984 Tenn.App. LEXIS 3424 (Tenn.Ct. App. Mar. 31, 1984).

The trustee has standing to maintain the actions in Counts 5 and 10.

### *In Pari Delicto*

Defendants move to dismiss Counts 5 and 10 on the basis of *in pari delicto.*

*In pari delicto* is an equitable defense that " 'refers to the plaintiff's participation in the same wrongdoing as the defendant.' " *In re Dublin Sec., Inc.,* 133 F.3d at 380 (quoting *Bubis v. Blanton,* 885 F.2d 317, 321 n. 1 (6th Cir.1989)). The phrase "in pari delicto" is part of a longer expression "In pari delicto potior est conditio defendentis,' which means that where the wrong of both parties is equal, the position of the defendant is the stronger." *Theye v. Bates,* 166 Ind.App. 652, 337 N.E.2d 837, 844 (1975) (quoting W.M. Moldoff, Annotation, *Purchaser's Rights to Set Up Invalidity of Contract Because of Violation of State Securities Regulation as Affected by Doctrines of Estoppel or Pari Delicto,* 84 A.L.R.2d 479, 491, 1962 WL 13660). "This principle prevents a plaintiff from recovering damages arising from a wrongdoing for which the plaintiff bears substantial responsibility." *DeNune v. Consolidated Capital of N. Am., Inc.,* 288 F.Supp.2d 844, 851 (N.D.Ohio 2003) (citation omitted).

Citing *Dublin Securities,* the Defendants argue that Buerger was the sole director of the Debtors and his participation in the acts complained of in Counts 5 and 10 bars the trustee's recovery on behalf of the debtor corporations. In *Dublin Securities,* the Sixth Circuit allowed the defense of *in pari delicto* on a motion to dismiss a bankruptcy trustee's complaint against lawyers who counseled the Debtor in devising and carrying out fraudulent stock offerings. The Sixth Circuit acknowledged that *in pari delicto* is an "equitable defense." The trustee insisted that the defense of *in pari delicto* required a fact-finding inquiry and could not be resolved on a motion to dismiss. The Sixth Circuit found that the defense could be resolved without trial because the trustee conceded that "the debtors' own actions were instrumental in perpetrating the fraud ... [and] that the debtors inten-

18. *See* Count 13.

tionally defrauded their investors." *Dublin Sec.,* 133 F.3d at 380.

*Dublin Securities* was distinguished by an Ohio district court in *DeNune.* The plaintiff in *DeNune* was the receiver for TPSS Acquisition Corp., a wholly owned subsidiary of defendant, Consolidated Capital of North America. The other defendants were officers and directors of Consolidated. The receiver alleged that the parent corporation (Consolidated) and its officers and directors looted assets from TPSS. The defendants asserted that the receiver was barred by *in pari delicto* from bringing any action based on the alleged looting of TPSS, because any conduct of the defendants could be imputed to TPSS as the wholly owned subsidiary of Consolidated. Rejecting the defendants' interpretation of the doctrine, the *DeNune* court explained:

> [The receiver] has alleged a one-way transfer of funds: from TPSS to Consolidated and the related defendants. TPSS and its creditors are the victims of the alleged fraud, not its perpetrators or beneficiaries.... [As] explained in a closely analogous case, wherein an appointed receiver sued to recover looted corporate assets:
>
>> "The appointment of the receiver removed the wrongdoer from the scene .... Put differently, the defense of in pari delicto loses its sting when the person who is in parti delicto is eliminated. Now that the corporation[ ] ... [is] controlled by a receiver whose only object is to maximize the value of the corporation[ ] for the benefit of [its] investors and creditors, we cannot see an objection to the receiver's bringing suit to recover corporate assets unlawfully dissipated by [a principal of the corporation]."

*DeNune,* 288 F.Supp.2d at 851 (quoting *Scholes v. Lehmann,* 56 F.3d 750, 754–55

(7th Cir.1995)). The *DeNune* court distinguished *Dublin Securities* on the ground that the trustee in *Dublin Securities* "specifically admitted the corporation's complicity/instrumentality in the fraud perpetrated by the defendant law firms." *Id.* at 851 n. 2.

██ "[T]he equitable context in which the in pari delicto defense is asserted is crucial." *Baker O'Neal Holdings, Inc. v. Ernst & Young LLP,* No. 1:03–CV–0132–DFH, 2004 WL 771230 (S.D.Ind. Mar.24, 2004). As the Second Circuit recognized in *Kalb, Voorhis & Co. v. American Financial Corp.,* 8 F.3d 130 (2d Cir.1993), and observed later in *Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,* 322 F.3d 147 (2d Cir.2003), "where the parties do not stand on equal terms and one party controls the other, the *in pari delicto* doctrine does not apply." *See also See Baker O'Neal Holdings, Inc. v. Ernst & Young LLP,* 2004 WL 771230, at *9–10 (Application of *in pari delicto* not appropriate when pleadings allege that the defendants were involved directly in the fraudulent conduct and benefited from it. "The risk of a liberal application of in pari delicto is that tortfeasors preparing to defraud an entity could potentially immunize themselves from liability simply by enlisting the help of an executive in the victim-corporation.... Outside of a fraudulent conveyance scenario, the best case for not applying the in pari delicto defense is where the insider and the third-party tortfeasor were essentially acting as co-conspirators.").

██ In *Dublin Securities,* the plaintiff's admissions "establishe[d] conclusively that the debtors were at least as culpable as the defendants[.]" *Dublin Sec.,* 133 F.3d at 380. Here, as in *DeNune,* no similar conclusion is conceded or evident from the pleadings. To the contrary, it is alleged that Defendants GM, Lear, JCI,

BBK and CMD usurped control and management of the Debtors for the benefit of the Controlling Customers, causing great injury to the Debtors. Buerger alleges in his cross-claim [19] that the Controlling Customers took over, put their agents in charge of management and operations of the Debtors and pushed out the existing officers and managers. If proven, these allegations will place this case among those in which "delicto" is present, but not "in pari." *See Kalb, Voorhis & Co. v. American Fin. Corp.*, 8 F.3d at 133 ("Because Appellant alleges that AFC dominated and controlled Circle K, the *in pari delicto* doctrine would not bar Circle K from asserting an alter ego claim[.]"); *Official Comm. of Unsecured Creditors v. Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 518 (Bankr.S.D.N.Y. 1999) ("In that the Committee has sufficiently alleged that Austin and Schneider dominated and controlled the Debtors in both its equitable subordination and lender liability claims, the *in pari delicto* defense is inapplicable regardless of whether the Committee is considered to be representing the interests of all the Debtors or only the Operating Debtors. 'Where the parties do not stand on equal terms and one party controls the other, the in pari delicto doctrine does not apply.'") (citation omitted). *See also DeNune*, 288 F.Supp.2d 844.

The Defendants will have ample opportunity to present their equitable defense of *in pari delicto*. On these Motions to dismiss, it cannot be said that the allegations of the Complaint establish the defense as a matter of law.

**19.** *See, e.g., Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir.1999) (court can consider public records in ruling on a Rule 12(b)(6) motion), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Nieman*

## F. Count 6

Count 6 of the First Amended Complaint alleges preferential transfers under § 547(b) to Defendants Buerger, DMW, GM, JCI, Lear, BBK, CF and CMD. The elements of a preferential transfer are well-defined in 11 U.S.C. § 547(b): (1) a transfer of an interest of the debtor in property; (2) to or for the benefit of a creditor; (3) for or on account of an antecedent debt; (4) made while the debtor was insolvent; (5) made within 90 days before the petition (or between 90 days and one year if the creditor is an insider); (6) that enables the creditor to receive more than if the transfer had not been made and the creditor received payment in a hypothetical Chapter 7 case. *Spradlin v. Jarvis (In re Tri-City Turf Club, Inc.)*, 323 F.3d 439, 443 (6th Cir. 2003); *Ray v. City Bank & Trust Co. (In re C-L Cartage Co., Inc.)*, 899 F.2d 1490, 1492 (6th Cir.1990).

The First Amended Complaint recites that each of the elements of a preference under § 547(b) is present with respect to transfers to each of the named Defendants during the year before the petitions. In paragraphs 49–54, the First Amended Complaint lists eight specific payments by DMC to BBK, GM and JCI, six specific transfers by DMC to CMD (directly or through BBK) and one transfer from DMT to DMW. Exhibit A to the First Amended Complaint lists transfers from DMC to Buerger during 2001. Elsewhere—in paragraph 26 and in Count 12—the First Amended Complaint describes the transfer of $750,000 to CF and CMD in April, 2001.

*v. NLO, Inc.*, 108 F.3d 1546, 1554 (6th Cir. 1997) (court may consider public records); *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir.1996) (court may consider documents of which it may take judicial notice).

■ Paragraph 45 of the Complaint alleges that after September 2000, GM, JCI, Lear, BBK and CMD became control persons and insiders of the debtors within the meaning of § 101(31).[20] Courts have recognized that a creditor or other entity that dominates or controls the business and financial decisions of a debtor can become an insider for purposes of the one year reach back for preference recovery under § 547(b)(4)(B). *See, e.g., Estes v. N & D Props., Inc. (In re N & D Props., Inc.),* 799 F.2d 726 (11th Cir.1986); *Wilson v. Huffman (In re Missionary Baptist Found. of Am., Inc.),* 712 F.2d 206 (5th Cir.1983).

Paragraph 50 of the First Amended Complaint lists transfers to BBK, GM and JCI within a year of the petition. All the elements of § 547(b) are alleged with respect to these Defendants and the listed transfers. The same is true of the transfers to CMD directly or through BBK in paragraph 51. Section 550 includes in the scope of preference recovery that a mediate or intermediate transferee is liable when a transfer is avoidable under § 547(b). *See C–L Cartage,* 899 F.2d at 1493–95. Similarly, paragraph 52 states a claim for recovery of a preferential payment from DMT to DMW. DMW is an affiliate of the debtors under § 101(2)(B),[21] thus the one-year reach back applies. *See*

11 U.S.C. § 101(31)(E) (insider includes affiliate).

Carson Fischer is not named as an insider or control person in paragraph 45 of the First Amended Complaint. Without that claim, Plaintiff's preference action against CF is limited to the 90–day period before the petition. The only specific allegation in the First Amended Complaint of a transfer of property of the debtor to CF is in paragraph 26 and in Count 12 (First Am. Compl. ¶ ¶ 62–64).

In April, 2001, $750,000 was loaned to Del–Met by GM, JCI and Lear and then paid to CF and CMD as fees in connection with the Accommodation Agreement. April of 2001 is more than 90 days but less than a year before November 28, 2001.

It is alleged in the First Amended Complaint that the Accommodation Agreement was drafted for the benefit of the Controlling Customers—GM, JCI and Lear. The payment of $750,000 by the debtors to CF and CMD as fees in connection with the Accommodation Agreement would be "for the benefit of" the Controlling Customers and thus could be recoverable as a preference from these insider defendants or from the transferee, CMD. *See* 11 U.S.C. § 550(a)(1) ("[T]he trustee may recover ... the value of such property, from—...

20. 11 U.S.C. § 101(31)(B) provides that "insider" includes:

if the debtor is a corporation—
(i) director of the debtor;
(ii) officer of the debtor;
(iii) person in control of the debtor;
(iv) partnership in which the debtor is a general partner;
(v) general partner of the debtor; or
(vi) relative of a general partner, director, officer, or person in control of the debtor[.]

21. 11 U.S.C. § 101(2)(B) provides:

(2) "affiliate" means—

(B) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities—
(i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or
(ii) solely to secure a debt, if such entity has not in fact exercised such power to vote[.]

the initial transferee ... or the entity for whose benefit such transfer was made.").

Prior to the 1994 amendments to § 550(c), this $750,000 transfer was also recoverable in the Sixth Circuit from CF, the non-insider. *See C–L Cartage*, 899 F.2d at 1495 ("We prefer a literal reading of [§§ 547 and 550] permitting recovery from non-insider transferees for payments made during the extended preference period which benefit insider creditors."). After the 1994 amendments, the absence of an allegation that CF was an insider protects CF from recovery of preferential transfers outside of 90 days from the petition.

Accordingly, Count 6 states a cause of action against GM, JCI, Lear and CMD with respect to the $750,000 transfer to CF and CMD in April 2001. Count 6 states no cognizable claim against CF.

Finally, Exhibit A to the First Amended Complaint states a claim for recovery of preferential transfers to Defendant Buerger by DMC. The Plaintiff can prove facts to bring some of the transfers listed in Exhibit A within the one year prior to November 28, 2001.

Although the allegations of some of the elements in § 547(b) are generally stated in Count 6, these Defendants are clearly on notice that they are alleged to have received preferential payments from the debtors during the year before bankruptcy. The First Amended Complaint and Exhibit A identify many specific amounts and dates and the sources of challenged transfers. The Defendants alleged to be insiders are identified by name and their connections to transfers that may be preferential are explained. Insolvency, antecedent debt and the "greater percentage" requirement are alleged. Count 6 states claims for relief under §§ 547 and 550 against all named Defendants except CF.

### G. Count 7

Count 7 of the First Amended Complaint alleges that Defendant Carson Fischer was the law firm for the Debtors and DMW from 1999 to 2001, and represented them during the takeover by the Controlling Customers, in connection with the Accommodation Agreement and during the transfer of assets from the Debtors to DMW. Plaintiff asserts that CF had a duty to "protect the separate interests of DMC and DMT" and that it breached that duty. Further, Plaintiff alleges that CF had a conflict of interest in its representation of DMC and DMT and its representation of Defendants Buerger and DMW, and that the interests of the Defendants were preferred.

CF's Motion to dismiss challenges the timeliness of Plaintiff's action, asserting that professional negligence actions have a one year statute of limitations under Tennessee law. *See* Tenn. Code Ann. § 28–3–104.

The parties stipulated that Tennessee law controls the "state law counts" for purposes of these Motions to dismiss. In their stipulation, the parties listed many counts of the First Amended Complaint that involved state law. Incomprehensibly, Count 7 was not among them. In their briefs, Plaintiff and CF discuss the Tennessee statute of limitations on actions against attorneys. Plaintiff filed a Supplemental Brief arguing the contradictory position that "Michigan has the most significant contacts" with respect to the legal malpractice claim in Count 7.

Generally, "a malpractice claim against a firm's lawyer is determined by the law of the state where the services are performed, for that state's law supplies the standard of performance and that is where the client normally would suffer injury." *In re Bridgestone/Firestone, Inc.*, 288 F.3d

1012, 1018 (7th Cir.2002). Under state or federal choice of law principles, courts look at the "significance of the relationship of a state with the occurrence and the parties." Among the factors to consider are: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence or place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered. *Novartis Crop Protection, Inc. v. American Crop Servs., Inc. (In re American Crop Servs., Inc.)*, 258 B.R. 699 (Bankr.W.D.Tenn.2001) (citing *Charash v. Oberlin College*, 14 F.3d 291, 297 (6th Cir.1994)).

■■■ The injuries to the debtors alleged in the First Amended Complaint seem to have occurred in Tennessee. The debtors, though incorporated elsewhere, are certainly most connected to Tennessee. No facts are alleged in the First Amended Complaint connecting the events in this lawsuit to Michigan. Consistent with the other stipulations of the parties, Tennessee law will be applied to CF's Motion to dismiss Count 7.

Plaintiff refers to Count 7 as claims for legal malpractice and an action for breach of fiduciary duties. Defendant sees Count 7 as a professional malpractice action only. This difference in characterization determines whether the one-year limitation on malpractice actions applies (TENN. CODE ANN. § 28–3–104) or the three-year limitation applicable to breach of fiduciary duty[22] (TENN. CODE ANN. § 28–3–105), or both.

■■■ As explained by the Tennessee Supreme Court, to determine which statute of limitations applies, courts should determine "the nature of the cause of action alleged.... The gravamen of a complaint and the injury alleged.... To ascertain the gravamen of the action, the Court must look at the basis for which damages are sought." *Mike v. Po Group, Inc.*, 937 S.W.2d 790, 793 (Tenn.1996). This analysis is not easily applied to Count 7. As one commentator explains:

> Three distinct causes of action are potentially available to clients for misbehavior by their lawyers: (1) breach of fiduciary duty; (2) breach of contract; and (3) the tort of malpractice. The courts, however, are not in agreement on the exact nature of and parameters for these causes of action. Many refuse to recognize the distinctions and dichotomies between and among the actions, and conclude that regardless of how the cause is characterized it is essentially a tort action for malpractice.
>
> . . . .
>
> Commentators suggest that the tort of breach of fiduciary duty, while involving a wrong distinct and independent from professional negligence, still constitutes legal malpractice. What this generalization overlooks is that legal malpractice is professional negligence. Like all negligence, professional negligence is failure to perform. Breach of fiduciary duty is not failure to perform. Breach of fiduciary duty is failure to adhere to the

---

**22.** As detailed above, breach of fiduciary duty has been identified as a common law tort, with a three year limitation period under Tennessee law. The Tennessee Supreme Court observed that "[t]here is a growing common law trend to declare 'that a breach of fiduciary duty is a tort.'" *Mike v. Po Group, Inc.*, 937 S.W.2d 790, 795 (Tenn.1996) (citations omitted) (In an action for breach of fiduciary duty, "the applicable limitations period is three years as provided in TENN. CODE ANN. § 28–3–105."). Michigan case law has also characterized a claim for breach of fiduciary duty as a common law tort and applied the three year, residual tort statute of limitations. *See, e.g., Borock v. Comerica Bank–Detroit*, 938 F.Supp. 428 (E.D.Mich.1996) (citing MICH. COMP. LAWS § 600.5805).

authority granted by the client. An attorney-client relationship imposes a fiduciary duty on the lawyer to represent the client with undivided loyalty. Failing to give undivided loyalty does not necessarily mean that the attorney performed legal services negligently. Instead, failure to give undivided loyalty to the client means that the attorney performed the legal service outside the scope of the authority (fiduciary duty) granted by the client.

Ray Ryden Anderson & Walter W. Steele, Jr., *Fiduciary Duty, Tort and Contract: A Primer on the Legal Malpractice Puzzle,* 47 SMU L. REV. 235, 235 & n. 4 (1994) (internal citations omitted).

Some state courts recognize breach of fiduciary duty as a tort distinct from professional negligence or malpractice. *See, e.g., Decker v. Mitchell (In re JTS Corp.),* 305 B.R. 529 (Bankr.N.D.Cal.2003) (under California law, citing *Stanley v. Richmond,* 35 Cal.App.4th 1070, 41 Cal.Rptr.2d 768, 776 (Cal.Ct.App.1995)). Other state courts hold that "[m]alpractice by any other name still constitutes malpractice.... [M]isconduct may consist either of negligence or of the breach of the contract of employment. It makes no difference whether the professional misconduct is found in tort or contract, it still constitutes malpractice." *Muir v. Hadler Real Estate Mgmt. Co.,* 4 Ohio App.3d 89, 446 N.E.2d 820, 822 (Ohio Ct.App.1982) (cited in *Omlin v. Kaufman & Cumberland Co. L.P.A.,* Case Nos. 00–04003 & 00–4142, 2001 WL 493387 (6th Cir. May 1, 2001)).

No Tennessee case [23] is offered by the parties either accepting or rejecting separate causes of action against a lawyer for malpractice and breach of fiduciary duty in connection with client representation. In an unreported decision, the Tennessee Court of Appeals observed as much:

[T]he duty alleged to have been breached in the case before us is one imposed and established by the Code of Professional Responsibility. The duty to maintain client confidences and secrets and not to use them after the termination of the attorney-client relationship is part of the ethical rules that govern attorney conduct. The Tennessee Supreme Court has the exclusive power to regulate the conduct of lawyers in the State of Tennessee. Our Supreme Court has not determined that a cause of action for breach of fiduciary duty lies against an attorney when the only allegation is a breach of the Code of Professional Responsibility. Because we have found that [plaintiff's] complaints do not provide a sufficient factual basis for its allegations that [defendant] used client confidences or secrets, we need not determine whether [plaintiff] could bring a cause of action for breach of fiduciary duty, separate from a malpractice action, against an attorney.

*Image Outdoor Advertising, Inc. v. CSX Transp., Inc.,* Case No. M2000–03207–COA–R3CV, 2003 WL 21338700, at *10–11 (Tenn.Ct.App. June 10, 2003) (internal citations omitted).

■ This court need not resolve whether the Tennessee Supreme Court

---

**23.** Michigan cases suggest a separate tort action would be recognized under Michigan law. *See Brownell v. Garber,* 199 Mich.App. 519, 503 N.W.2d 81, 87 (1993) (" '[t]he type of interest allegedly harmed is the focal point in determining which limitation period controls.' Applying this test, we conclude that the interest involved in a claim for damages arising out of a fraudulent misrepresentation differs from the interest involved in a case alleging that a professional breached the applicable standard of care. Simply put, fraud is distinct from malpractice.") (internal quotation omitted). *See also Sarr v. Smith,* Case No. 242395, 2004 WL 981162 (Mich.Ct.App. May 6, 2004).

would allow separate actions against an attorney for malpractice and breach of fiduciary duties because Plaintiff has not pleaded misconduct by CF other than traditional malpractice. Count 7 redundantly recites that CF had "conflict[s] of interest" and failed to "protect the separate interests of DMC and DMT." (First Am. Compl. ¶ 57.) That CF was the debtors' lawyer in connection with the Accommodation Agreement and the transfers of assets to DMW (First Am. Compl. ¶ 55) is a third restatement of the allegation that CF breached its duty to represent the debtors' interests—not the conflicting interests of DMW or the Controlling Customers. CF is not named among the "Control Persons" in paragraph 45 of the First Amended Complaint and is not named anywhere else in the Complaint with respect to any misconduct outside the attorney/client relationship.

Conflicts of interest are specifically addressed by the Code of Professional Responsibility and are appropriately characterized as a cause of action for attorney malpractice. *See Woodruff v. Tomlin,* 616 F.2d 924 (6th Cir.), *cert. denied,* 449 U.S. 888, 101 S.Ct. 246, 66 L.Ed.2d 114 (1980) (claim based on an attorney's conflict of interest is a malpractice claim under Tennessee law).

■■■■■ Under Tennessee law, the statute of limitations for "actions and suits against attorneys . . . for malpractice, whether the actions are grounded or based in contract or tort" is one year. TENN. CODE ANN. § 28-3-104.[24] "In legal malpractice actions, the one-year statute of limitations starts to run when the client suffers a legally cognizable injury resulting from an attorney's negligence or other wrongdoing, and the client knows or should know the facts sufficient to give notice of that injury." *Cherry v. Williams,* 36 S.W.3d 78 (Tenn.Ct.App.2000) (citing *John Kohl & Co., P.C. v. Dearborn & Ewing,* 977 S.W.2d 528, 532 (Tenn.1998); *Carvell v. Bottoms,* 900 S.W.2d 23, 29 (Tenn.1995); *Bradson Mercantile, Inc. v. Crabtree,* 1 S.W.3d 648, 653 (Tenn.Ct.App. 1999)). "Because negligence without injury is not actionable, the legal malpractice statute of limitations does not begin to run until an attorney's negligence has actually injured the client. And there is no injury until there is the loss of a right, remedy, or interest or the imposition of a liability. Before that time, any injury is only prospective and uncertain. There is no legally cognizable injury where there exists only the mere possibility of harm." *Id.* at 84 (internal quotations and citations omitted).

■■■■ Debtors' Chapter 7 cases were filed on November 28, 2001. Section 108(a) of the Bankruptcy Code extends the state law limitation period under certain circumstances:

If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only *before the later of*—(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or (2) two years after the order for relief.

11 U.S.C. § 108(a) (emphasis added).

Plaintiff filed her original Complaint on November 28, 2003, two years after the

---

**24.** Under Michigan law, MICH. COMP LAWS §§ 600.5805 and 600.5838, " 'a plaintiff in a legal malpractice action [must] file suit within two years of the attorney's last day of service, or within six months of when the plaintiff discovered, or should have discovered the claim.' " *Terrace Land Dev. Corp. v. Seeligson & Jordan,* 250 Mich.App. 452, 647 N.W.2d 524 (2002) (quoting *Gebhardt v. O'Rourke,* 444 Mich. 535, 510 N.W.2d 900 (1994)).

order for relief. Any malpractice action against CF that was viable at the petition was timely commenced with the filing of the original Complaint. *See Limor v. Weinstein & Sutton (In re SMEC, Inc.),* 160 B.R. 86 (M.D.Tenn.1993) (section 108(a) preserves malpractice action that could have been commenced on the petition date).

■■■ In the year prior to the petition, Plaintiff has alleged that CF was debtors' counsel and that in late 2000 when the Controlling Customers "brought in" BBK to "take over" the operations of Del–Met and brought in CMD to take over the accounting functions of Del–Met; in early 2001 when the Controlling Customers approached Bank One—Del–Met's lender—about restructuring Del–Met's debt; during the transfers of assets to DMW; and, in April 2001 when the Controlling Customers, Bank One, Del–Met and Buerger entered into the "Accommodation Agreement"—an agreement that Plaintiff contends sealed the fate of the Debtors. Some or all of these allegations fall within the limitation period for malpractice actions under Tennessee law. Count 7 states a claim against CF.

## H. Count 8

In Count 8, Plaintiff asserts that GM, Lear and JCI were unjustly enriched at the expense of the Debtors. Defendants move to dismiss on the ground that the existence of a contract precludes this unjust enrichment claim. Plaintiff responds that because "the valid contract defense to an unjust enrichment claim is an affirmative defense under Rule 8(c) . . . it is too early to tell whether any valid contracts exist[.]" (Pl. Resp. at 28–9.)

■■■ "Actions brought upon theories of unjust enrichment, quasi contract, contracts implied in law, and quantum meruit are essentially the same. Courts frequent-

ly employ the various terminology interchangeably to describe that class of implied obligations where, on the basis of justice and equity, the law will impose a contractual relationship between the parties, regardless of their assent thereto." *Paschall's, Inc. v. Dozier,* 219 Tenn. 45, 407 S.W.2d 150, 154 (1966). The law imposes a contract when there is proof (1) that no enforceable contract exists between the parties, and (2) the defendant will be unjustly enriched absent a court-created obligation. *Whitehaven Cmty. Baptist Church,* 973 S.W.2d 592, 596 (1998); *Swafford v. Harris,* 967 S.W.2d 319, 324 (Tenn.1998) (Unjust enrichment requires the absence of an existing, enforceable contract.); *Castelli v. Lien,* 910 S.W.2d 420, 427 (Tenn.Ct.App.1995).

■■■ There was a contract (or contracts) between the Debtor corporation(s) and the Defendants named in Count 8. Whether that contract encompassed the conduct for which a remedy may lie in unjust enrichment is a factual issue yet to be developed in this adversary proceeding. The First Amended Complaint alleges actions by the Controlling Customers that broadly exceed the boundaries of any contract so far described. The Controlling Customers are alleged to have unjustly enriched themselves by seizing the management and operations of the debtors—facts not consistent with the ordinary contractual relationship between a supplier and its customer. Whether these Defendants will prove an existing, enforceable contract sufficient in scope to preclude recovery for unjust enrichment remains to be seen. Dismissal of Count 8 under Rule 12(b)(6) is premature.

## I. Count 9

■■■ Plaintiff asserts that Buerger is liable to DMC on promissory notes in the

original principal amounts of $359,515 and $500,000. Buerger moves to dismiss on the ground that the First Amended Complaint fails to include copies of the notes and omits details such as maturity dates and the terms of repayment.

Dismissal under FED.R.CIV.P. 12(b)(6) requires that " 'it appears beyond doubt that the plaintiffs can prove no set of facts in support of [their] claim which would entitle [them] to relief.' " *Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 296 (6th Cir.1993) (quoting *Hospital Bldg. Co. v. Trustees of the Rex Hosp.*, 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976)). The plaintiff "need only give a 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651 (6th Cir.2005) (quoting *Lawler v. Marshall*, 898 F.2d 1196, 1199 (6th Cir.1990) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957))).

The First Amended Complaint is sufficient with respect to Buerger's liability on two notes in the precise principal amounts of $359,515 and $500,000. Buerger was the sole shareholder and director of the Debtors at all times material to this claim and has special knowledge of his own financial dealings with the debtors. The descriptions of these notes give Buerger fair notice of Plaintiff's action. The details await discovery and the assertion of defenses to collection. Count 9 survives.

## J. Count 11 [25]

Count 11 of the First Amended Complaint asserts that DMW, Buerger and GM willfully violated the automatic stay by selling DMC's assets to Zanini in May 2003. The Trustee contemporaneously protested this sale. Plaintiff demands actual and punitive damages.

Plaintiff does not cite 11 U.S.C. § 362(h), but her damage request implicates the statute. Section 362(h) provides: "An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."

■ The question whether a corporate debtor is an "individual" entitled to damages under § 362(h) has split the circuits.[26] The majority concludes that "corporations cannot sue under section 362(h) to obtain damages for violation of the automatic stay." *Spookyworld, Inc. v. Town of Berlin (In re Spookyworld, Inc.)*, 346 F.3d 1, 8 (1st Cir.2003). This plain reading of the statutory definitions is convincing. Section 362(h) does not provide a damages remedy for these corporate debtors.

■ This conclusion does not leave these corporate debtors without redress for stay violations. "Corporations are not wholly without remedy for violations of the

---

**25.** Count 10 is covered above with Count 5.

**26.** *Compare Cuffee v. Atlantic Bus. & Cmty. Dev. Corp. (In re Atlantic Bus. & Cmty. Corp.)*, 901 F.2d 325, 328–29 (3d Cir.1990) (corporate debtor allowed punitive damages for willful violation of the automatic stay), *and Budget Serv. Co. v. Better Homes of Va., Inc.*, 804 F.2d 289, 292 (4th Cir.1986) (individual includes a corporate debtor), *with Spookyworld, Inc. v. Town of Berlin (In re Spookyworld, Inc.)*, 346 F.3d 1 (1st Cir.2003) (section

362(h)'s damages are limited to natural persons, not corporate debtors), *Sosne v. Reinert & Duree, P.C. (In re Just Brakes Corporate Sys., Inc.)*, 108 F.3d 881, 884–85 (8th Cir.1997) (same), *Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539, 1549–53 (11th Cir.1996) (same), *Johnston Envtl. Corp. v. Knight (In re Goodman)*, 991 F.2d 613, 618–20 (9th Cir.1993) (same), *and Maritime Asbestosis Legal Clinic v. LTV Steel Co. (In re Chateaugay Corp.)*, 920 F.2d 183, 184–87 (2d Cir.1990) (same).

automatic stay: under 11 U.S.C. § 105(a) (2000), '[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.' Prior to the enactment of section 362(h) in 1984, contempt orders issued under section 105(a), including awards of damages, were routinely used to punish violations of the automatic stay." *In re Spookyworld, Inc.*, 346 F.3d at 8 (citations omitted).

■■■ The contempt remedy can be tailored to the nature and extent of the stay violation. In other counts, Plaintiff has asked for turnover of the estate property (or its value) transferred after the petitions in violation of the automatic stay. The Plaintiff has also pleaded that a constructive trust should be imposed on the proceeds from the postpetition sale of the debtors' assets.

Count 11 states a claim to the extent it seeks a determination that Buerger, DMW and GM violated the automatic stay. Remedies other than damages are not precluded on these Motions to dismiss.

## K. Count 12

Count 12 names Defendants GM, JCI, Lear and GMAC, and seeks recharacterization from debt to equity of loans by these Defendants to Del–Met. Without limitation, Plaintiff identifies a loan of $251,927 from Lear to Del–Met on April 9, 2001, a loan of $255,216 from JCI to Del–Met on April 10, 2001, and a loan of $242,857 from GM to Del–Met on April 10, 2001. (First Am. Compl. ¶ 63.)

Plaintiff asserts that GM, JCI, Lear and GMAC "knew or should have known that Del–Met was insolvent at the time that additional sums were lent to Del–Met[.]" (First Am. Compl. ¶ 64.) Plaintiff states that these loans were repaid in May 2003 (post petition) by DMW—a nondebtor— upon the sale of Del–Met's assets to Zani-

ni. Plaintiff asks that these loans be recharacterized from debt to equity, and that a constructive trust be impose on any loan repayments by DMW to these Defendants.

The timing of the loans described in Count 12 coincides with the Accommodation Agreement, dated April 10, 2001. Under the Accommodation Agreement, Del–Met was required to pay CF and CMD $750,000. The three loans in Count 12 total exactly $750,000. The Accommodation Agreement gave the Controlling Customers a lien on the debtors' assets.

The Plaintiff alleges in paragraphs 24, 25 and 26 that the Accommodation Agreement "solidified the Controlling Customers' control over the affairs of Del–Met." It is alleged that only the Controlling Customers benefited from the Accommodation Agreement. It certainly looks like the debtors paid for the Accommodation Agreement with money loaned by the Controlling Customers and then repaid by DMW from the sale of Del–Met's assets to Zanini. These transactions are evidence of domination, control and manipulation of the debtors by the Controlling Customers. As noted in Count 1 above, incurring $750,000 of debt for the benefit of the Controlling Customers, CF and CMD during the year before bankruptcy could be a fraudulent transfer. As explained in Count 6, payment of the $750,000 to CF and CMD may be preferential as to GM, JCI, Lear and CMD.

■■■ The Sixth Circuit has held that "[r]echaracterization is appropriate where the circumstances show that a debt transaction was 'actually [an] equity contribution [ ] *ab initio.*'" *Bayer Corp. v. Masco-Tech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 748 (6th Cir.2001) (quoting *In re Cold Harbor Assocs.*, 204 B.R. 904, 915 (Bankr.E.D.Va.1997)). The Sixth Circuit states eleven factors relevant to re-

characterization: (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments. *Roth Steel Tube Co. v. Commissioner,* 800 F.2d 625, 630 (6th Cir.1986). *See also In re AutoStyle Plastics, Inc.,* 269 F.3d at 750 n. 12 ("We believe that the *Roth Steel* factors provide a general framework for assessing recharacterization claims that is also appropriate in the bankruptcy context. We note, however, that there is some disagreement as to whether tax court recharacterization factors are appropriate for use in bankruptcy cases.").

 Plaintiff's recharacterization claim fails because there is no debt remaining to recharacterize. Plaintiff admits that the only debts identified in Count 12 were repaid from the postpetition proceeds of the sale of assets to Zanini.

Recognizing this defect in her recharacterization action, Plaintiff asks for relief consistent with the absence of debt—imposition of a constructive trust on debt payments by DMW.

 "A constructive trust may be imposed against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment or questionable means, has obtained an interest in property which he ought not in equity or in good conscience retain." *Intersparex Leddin KG v. Al–Haddad,* 852 S.W.2d 245, 249 (Tenn.Ct.App.1992) (citation omitted). Tennessee courts have imposed constructive trusts in four types of cases: (1) Where a person procures the legal title to property in violation of some duty, express or implied, to the true owner; (2) where the title to property is obtained by fraud, duress or other inequitable means; (3) where a person makes use of some relation of influence or confidence to obtain the legal title upon more advantageous terms than could otherwise have been obtained; and (4) where a person acquires property with notice that another is entitled to its benefits. *Myers v. Myers,* 891 S.W.2d 216, 219 (Tenn.Ct.App.1994) (citations omitted). Most importantly, "constructive trust is merely a remedy used by courts to enforce substantive rights; it is not itself a substantive right." *Rider ex rel. Rider v. Rider,* No. M2002–00556–COA–R3CV, 2003 WL 22345475 (Tenn.Ct.App. Oct.15, 2003) (citing *Howell Petroleum Corp. v. Samson Res. Co.,* 903 F.2d 778, 780 (10th Cir.1990)).

The constructive trust claim in Count 12 is an alternative remedy to recover assets sold by DMW to Zanini post petition which Plaintiff asserts were misappropriated or fraudulently conveyed from these bankruptcy estates. Also, mentioned above, imposition of a constructive trust may be an available remedy if stay violations are found under Count 11. But Count 12 does not state an independent cause of action for constructive trust.

## L. Count 13

 Count 13 of the First Amended Complaint asserts that the operations and financial affairs of DMC, DMT and DMW

were "so interrelated and their business affairs were conducted in such a manner that the three corporations constitute a single business enterprise[.]" (First Am. Compl. ¶ 65.) Plaintiff claims that the $5.2 million proceeds from the sale of assets by DMW to Zanini are property of the bankruptcy estates of DMC and DMT.

DMW and Buerger move to dismiss on the ground that Plaintiff does not have standing to pursue an action in the nature of "veil piercing." Defendants argue from Tennessee law that an action to disregard corporate form belongs to individual creditors as " '[t]he fraud from which it arises is not perpetrated upon the corporation, but upon third persons dealing with the corporation.' " (Def. DMW's Mem. at 7) (quoting *Brown v. Vencap Inv. Corp.*, 1984 Tenn.App. LEXIS 3424 (Tenn.Ct.App. Mar. 31, 1984).) Plaintiff cites *McLemore v. Olson (In re B & L Laboratories, Inc.)*, 62 B.R. 494 (Bankr.M.D.Tenn.1986), in support of standing.

■ Section 704 of the Bankruptcy Code directs the trustee to "collect and reduce to money the property of the estate[.]" 11 U.S.C. § 704(1). Property of the estate is defined in 11 U.S.C. § 541(a)(1) to include "all legal or equitable interests of the debtor in property as of the commencement of the case." Causes of action that belong to the debtor become property of the estate. *See, e.g.*, *Spartan Tube & Steel, Inc. v. Himmelspach (In re RCS Engineered Prods. Co.)*, 102 F.3d 223, 225 (6th Cir.1996). "Whether a particular cause of action is available to the debtor, and thus constitutes 'property of the estate,' is determined by state law." *In re RCS Engineered Prods. Co.*, 102 F.3d at 226 (citing *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)).

A variety of fact patterns, difficult or nonexistent state law and not altogether consistent interpretations of state law by federal courts have produced a patchwork of reported decisions addressing whether a bankruptcy trustee has standing to disregard corporate form in an action to reach the assets of a nondebtor or to hold a nondebtor responsible for debts of the debtor. *See, e.g.*, *In re RCS Engineered Prods. Co.*, 102 F.3d at 225 (applying Michigan law, trustee lacked standing to pursue alter ego claim against debtor's corporate parent); *Kalb, Voorhis & Co. v. American Fin. Corp.*, 8 F.3d 130 (2d Cir. 1993) (veil piercing claim belonged exclusively to New York corporation, not to its shareholders); *Steyr–Daimler–Puch of Am. Corp. v. Pappas*, 852 F.2d 132 (4th Cir.1988) (Virginia corporation can bring alter ego action to pierce its own corporate veil); *Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339 (7th Cir. 1987) (under Illinois and Indiana law, trustee has standing to pursue alter ego action; 11 U.S.C. § 544 also supports trustee's standing to represent the general interests of creditors) [27]; *Mixon v. Anderson (In re*

---

**27.** Several years after the Seventh Circuit's decision in *Koch Refining*, a similar issue reached the Supreme Court of Illinois in *In re Rehabilitation of Centaur Insurance Co.*, 158 Ill.2d 166, 198 Ill.Dec. 404, 632 N.E.2d 1015 (1994). The insurance rehabilitator asserted that only it had standing to bring an alter ego action against the parent company of an insolvent insurer. The insurance rehabilitator relied on the Seventh Circuit's interpretation of Illinois law in *Koch Refining*. The Supreme Court of Illinois rejected *Koch Refining*:

> The alter ego doctrine was developed for and has been traditionally used by third persons injured due to their reliance on the existence of a distinct corporate entity.... The doctrine of alter ego fastens liability on the individual who uses a corporation merely as an instrumentality to conduct his or her own personal business, and *such liability arises from fraud or injustice perpe-*

*Ozark Rest. Equip. Co.)*, 816 F.2d 1222 (8th Cir.), *cert. denied*, 484 U.S. 848, 108 S.Ct. 147, 98 L.Ed.2d 102 (1987) (under Arkansas law, subsidiary does not have standing to assert alter ego claim against parent corporation); *S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition, Inc.)*, 817 F.2d 1142 (5th Cir. 1987) (alter ego action was property of Texas corporate debtor's estate); *Turner v. Bolduc (In re Crowe Rope Indus., LLC)*, 307 B.R. 1 (Bankr.D.Me.2004) (under Maine law, trustee lacked standing to pursue veil piercing action to hold insider liable for LLC's debts); *Tsai v. Buildings by Jamie, Inc. (In re Buildings by Jamie, Inc.)*, 230 B.R. 36 (Bankr.D.N.J.1998) (under New Jersey law, trustee had standing to assert alter ego claim on behalf of estate); *Luper v. Banner Indus., Inc. (In re Lee Way Holding Co.)*, 105 B.R. 404 (Bankr.S.D.Ohio 1989) (trustee has standing under Ohio law to pursue alter ego claim against controlling shareholder). *See generally* Irve J. Goldman, *Whose Cause of Action is it, Anyway?*, 23–3 Am Bankr. Inst. J. 1 (2004).

The Sixth Circuit considered the standing of a Chapter 7 trustee to bring an alter ego action under Michigan law in *RCS*. The trustee in *RCS* alleged that the debtor's corporate parent should be liable for the contracts of the debtor because the debtor was a mere instrumentality of the parent. The Sixth Circuit found no Michigan decision addressing whether a corporation could challenge its own existence. But, "[a] review of Michigan alter ego cases and basic principles of the law of corporations" led the Sixth Circuit to conclude "that under Michigan law a subsidiary does not have standing to sue its shareholders or its parent company under an alter ego theory." *In re RCS Engineered Prods. Co.*, 102 F.3d at 226. The trustee in bankruptcy, standing in the shoes of the debtor corporation, had no standing to pursue the action.

No Tennessee Supreme Court decision has been found addressing whether a corporation can maintain an alter ego or veil-piercing action against another corporation, alleging a single business enterprise.[28]

---

trated not on the corporation but on third persons dealing with the corporation. The corporate form may be disregarded only where equity requires the action to assist a third party.'
'Generally, the corporate veil is never pierced for the benefit of the corporation or its stockholders[.]'
*Id.* at 1018 (emphasis in original; internal citations omitted).
The Illinois court noted, however, that the rehabilitator was not powerless to assert claims against the parent company:
The ... rehabilitator[ ] may assert an action for breach of fiduciary duty against [the parent corporation] .... [C]reditors are generally not capable of asserting such actions, as they are not owed a duty by a subsidiary's parent corporation.... Thus, in a practical sense, it is arguable that there is no need at all for the [rehabilitator] to even assert an alter ego action, as he already has a similar action. However the alter ego action is needed by the creditors,

who do not have standing to bring action for breaches of fiduciary duty.
*Id.* at 1018 (citing *Macaluso v. Jenkins*, 95 Ill.App.3d 461, 50 Ill.Dec. 934, 420 N.E.2d 251 (1981)).
The Supreme Court of Indiana has also expressed an opinion at odds with *Koch Refining* with respect to the use of the alter ego doctrine under Indiana law: " 'While we have expressed willingness to use our equitable power to disregard the corporate form to prevent fraud or unfairness to third parties, we perceive little likelihood that equity will ever require us to pierce the corporate veil to protect the same party that erected it.' " *Greater Hammond Cmty. Servs., Inc. v. Mutka*, 735 N.E.2d 780, 785 (Ind.2000) (quoting *McQuade v. Draw Tite, Inc.*, 659 N.E.2d 1016, 1020 (Ind.1995)).

28. Recognizing the confusion that has developed as federal courts construe state law, the Court of Appeals for the Eleventh Circuit recently certified to the Georgia Supreme Court

A federal court can consider other appellate decisions of a state when no authority is found from the state's highest court. *See, e.g., Meridian Mut. Ins. Co. v. Kellman,* 197 F.3d 1178, 1181 (6th Cir.1999) ("If the state's highest court has not addressed the issue, the federal court must attempt to ascertain how that court would rule if it were faced with the issue. The Court may use the decisional law of the state's lower courts, other federal courts construing state law, restatements of law, law review commentaries, and other jurisdictions on the 'majority' rule in making this determination. A federal court should not disregard the decisions of intermediate appellate state courts unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.") (citing *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967); *Grantham & Mann v. American Safety Prods.,* 831 F.2d 596, 608 (6th Cir.1987)).

 There is an *unpublished*[29] decision of the Court of appeals of Tennessee holding that the bankruptcy trustee for a debtor corporation does not have standing in an alter ego action against a venture capital firm that controlled the debtor. *Brown v. Vencap Inv. Corp.,* 1984 Tenn. App. LEXIS 3424 (Tenn.Ct.App., Mar. 31, 1984). A federal court is not bound by an unreported decision from the Tennessee Court of Appeals. *See Jones v. Allstate Ins. Co.,* 42 F.3d 1388, 1994 WL 677676, at *2 (6th Cir.1994) (table decision). Under Tennessee law, unpublished appellate decisions are binding only on the parties; the Tennessee Supreme Court discourages the citing of unpublished opinions. *See Southern Ry. Co. v. Foote Mineral Co.,* 384 F.2d 224 (6th Cir.1967). On the other hand, it is often said by the Tennessee courts that the reasoning in unpublished appellate decisions can be "highly persuasive" even when the holding is not considered authority. *See State v. Franklin,* 919 S.W.2d 362, 366 (Tenn.Crim.App.1995); *Cook v. State,* 506 S.W.2d 955, 958 (Tenn.Crim. App.1973).

In *Vencap,* the bankruptcy trustee for two corporate debtors brought an action in

the issue whether "a corporate entity in bankruptcy has exclusive standing to bring a state alter ego action against its principal." *Baillie Lumber Co., LP v. Thompson (In re Icarus Holding, LLC),* 391 F.3d 1315 (11th Cir.2004). The Eleventh Circuit held "that in order to bring an exclusive alter ego action under section 541, a bankruptcy trustee's claim should (1) be a general claim that is common to all creditors and (2) be allowed by state law." *Id.* at 1321. The claim is a general one, the court explained, "when liability extends 'to all creditors of the corporation without regard to the personal dealing between such officers and such creditors.'" *Id.* (quoting *In re Koch Refining,* 831 F.2d at 1348). The court found the first element satisfied, as the action at issue concerned the alleged looting of corporate assets by the debtor's shareholder. However, the court could find no clear demarcation in Georgia law that the alter ego action belonged to the bankruptcy estate. With bankruptcy courts in Georgia split on the issue, the Eleventh Circuit certified the question to the Georgia Supreme Court. At this writing, the Georgia Supreme Court has not responded.

29. The meaning of "unpublished" in this context is not completely clear. Of course, LEXIS is a publishing company and *Brown v. Vencap* is "published" on LEXIS for anyone with access to read at leisure. But LEXIS is not the "official" publishing outlet for the Court of Appeals of Tennessee. *See* Tenn. Sup. Ct. R. 4 (designating Southwestern Reporter 2d as the "official reporter"). *Brown v. Vencap* does not appear in West's Southwestern Reporter 2d. As presented in the LEXIS database, *Brown v. Vencap* nowhere recites that it is "not for publication" or similar limitation. Other federal courts have concluded that *Brown v. Vencap* is "unreported." *See Koch Refining,* 831 F.2d at 1347 ("[An unreported opinion of the Tennessee Court of Appeals.").

Tennessee state court on behalf of the debtors and their creditors for breach of fiduciary duty, alter ego liability and fraud. The trustee asserted that the debtor corporations were the alter egos of *Vencap*—a commonly owned and managed venture capital firm. The Defendants challenged the trustee's standing. The Court of Appeals of Tennessee held that the trustee had standing in the action for breach of fiduciary duties owed to the debtor corporations, but lacked standing to pursue the alter ego claim:

> There is authority to the contrary but we think the majority rule is to the effect that [an action to pierce the corporate veil and reach the assets of another corporation as its alter ego] is a right vested in the individual creditors. It is not a right which belongs to the bankrupt and under the Bankruptcy Act the trustee has no authority to maintain such action.... '[T]he trustee, as contrasted with the creditors, alone has the power to sue on a claim belonging to the estate, and to recover property fraudulently or preferentially transferred .... In any event, the claims sued upon by the trustee must belong to the bankrupt estate, and a trustee may not sue upon claims not so belonging, even though they were assigned to him by creditors for convenience and other purposes.' '[A] trustee of a bankrupt corporation succeeds to the title of the corporation as to all rights, both common-law and statutory, existing for the benefit of the corporation, and as such trustee it is his duty to enforce these rights, if valuable. But the trustee's title to corporate cause of action arising prior to bankruptcy is no better than that of the bankrupt corporation. Consequently, if the trustee's petition or complaint does not set forth

probative facts sufficient to have constituted a cause of action against the defendant by the corporation had it not been adjudged a bankrupt, the petition states no cause of action in favor of the trustee.'

> . . . .

> 'The doctrine of alter ego does not create assets for or in the corporation. It simply fastens liability upon the individual who uses the corporation merely as an instrumentality in the conduct of his own personal business. The liability springs from fraud. The fraud from which it arises is not perpetrated upon the corporation, but upon third persons dealing with the corporation. And the doctrine has been invoked only at the behest of such third parties as have suffered injury by reason of the fraud.'

> . . . .

> Under the holdings of our courts all creditors of a bankrupt corporation do not necessarily stand in the same posture when asserting a claim against a third party on the alter ego theory. While some may be in a position to maintain their claims, others may not.

*Brown v. Vencap Inv. Corp.*, 1984 Tenn. App. LEXIS 3424, at *9–25 (internal citations omitted).

The parties have cited no Tennessee decision questioning the reasoning in *Vencap*.[30] On much less clear authority under Michigan law, in *RCS* the Sixth Circuit cited "basic principles of the law of corporations" to conclude that a bankruptcy trustee lacked standing to reach the shareholders of a debtor corporation on an alter ego theory. *Vencap* is persuasive that Tennessee law does not support this trustee's standing to pierce the corporate veils

---

**30.** This court's decision in *B & L Laboratories* does not cite *Vencap* nor discuss the standing of the trustee—an issue not raised by the parties in that case. The outcome in *B & L Laboratories* was based on several theories, not all of which involved veil piercing.

of DMC, DMT and DMW to create a single business enterprise.

■ In what might be characterized as an alternative holding, the Seventh Circuit in *Koch Refining* found standing for the bankruptcy trustee to pursue an alter ego claim based on § 544(a).[31] Under § 544(a), the trustee can assert some rights of creditors that did not belong to the debtor corporation before bankruptcy. If creditors of DMC or DMT could bring alter ego claims against DMW, it might be argued that the trustee succeeds to that standing through § 544(a).

In *Koch Refining,* the Seventh Circuit acknowledged that § 544(a) is a limited grant to the bankruptcy trustee of rights ordinarily only exercisable by individual creditors outside of bankruptcy. In particular, if a cause of action is specific to an individual creditor (or class of creditors), *Caplin v. Marine Midland Grace Trust Co. of New York,* 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), gets in the way of the trustee's standing.

■ In *Caplin,* the Supreme Court held that a bankruptcy trustee lacked standing to sue an indenture trustee on behalf of holders of debentures issued by the debtor corporation. The Supreme Court found no provision of the former Bankruptcy Act authorizing that cause of action. *Caplin* was not upset by the enactment of the Bankruptcy Code; *Caplin* is often cited for the proposition that bankruptcy trustees cannot bring causes of action that are specific to individual creditors or classes of creditors. *See, e.g., Still v. Congress Fin. Corp. (In re Southwest Equip. Rental, Inc.),* 102 B.R. 132, 138 (E.D.Tenn.1989) ("*Caplin* remains good law ... there is no express statutory authority providing the trustee with the right to file creditors' claims against third parties; and, the trustee's power to bring general claims on behalf of all creditors remains intact.").

In *Koch Refining,* the Seventh Circuit found that an alter ego action under Illinois or Indiana law against the shareholders of a debtor corporation was "general" to all creditors and thus was available to the trustee in bankruptcy. As explained by the court:

> The trustee represents not only the rights of the debtor but also the interests of the creditors of the debtor. Pursuant to 11 U.S.C. § 544 the trustee, in his capacity as a creditor, may bring suit to reach property or choses in action belonging to the estate that will then be distributed to all creditors. The trustee's single effort eliminates the many wasteful and competitive suits of individ-

---

**31.** 11 U.S.C. § 544(a) provides:

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

(3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

ual creditors.... In [Illinois and Indiana], the alter ego theory is an equitable, remedial doctrine that may be asserted by any creditor without regard to the specific nature of his relationship with the corporation and its alleged alter ego.... This court previously recognized the bankruptcy trustee, representing creditors, as the proper party to bring an alter ego claim under Wisconsin law.... We now find that, under Illinois and Indiana law as well, a bankruptcy trustee can bring an alter ego claim of action. State law permits the alter ego claim to be asserted by the trustee in pursuing all funds available as section 541 property of the estate. And federal bankruptcy law permits the trustee to recover property on behalf of all creditors for equitable distribution. Furthermore, this logical procedure obviates multiple liable of the debtor to separate creditors and accords with the Bankruptcy Code's ultimate goal of balancing the equities and interests of all affected parties in a bankruptcy case. *Koch Refining*, 831 F.2d at 1342–46.

In *RCS*, the Sixth Circuit did not discuss standing based on § 544(a). The argument was addressed by the bankruptcy court in *RCS* and, citing earlier Sixth Circuit authority, § 544 was rejected as a source for the trustee's standing to bring a veil-piercing action. *Himmelspach v. Railcar Specialties, Inc. (In re R.C.S. Engineered Prods. Co.)*, 168 B.R. 598, 605–06 (Bankr.E.D.Mich.1994), *rev'd*, 102 F.3d 223 (6th Cir.1996).

The Sixth Circuit case relied upon by the bankruptcy court in *RCS—DSQ Prop. Co., Ltd. v. DeLorean*, 891 F.2d 128 (6th Cir.1989)—is modest authority for the conclusion that § 544 will not support trustee standing to bring an alter ego or veil-piercing action on behalf of a debtor corporation. *DeLorean* does not cite or discuss

§ 544. Standing to bring an alter ego action was not the issue before the Sixth Circuit in *DeLorean*. The Sixth Circuit does make the (perhaps, over broad) statement that the Bankruptcy Code "has no provision providing for a bankruptcy trustee to sue third parties on behalf of creditors." *DSQ Prop. Co.*, 891 F.2d at 131.

There is language in *Vencap* indicating that the predicate in *Koch Refining* for use of § 544(a)—that the veil-piercing cause of action is "general" to all creditors under state law—is not the law of Tennessee. As quoted more fully above, the Court of Appeals of Tennessee in *Vencap* said:

> Under the holdings of our courts all creditors of a bankrupt corporation do no necessarily stand in the same posture when asserting a claim against a third party on the alter ego theory. While some may be in a position to maintain their claims, others may not.

*Brown v. Vencap*, 1984 Tenn.App. LEXIS 3424 at *24–25 (internal citations omitted).

Despite the attractive logic of *Koch Refining*, this court concludes that the Sixth Circuit would not embrace § 544(a) as a source of standing for a Chapter 7 trustee's single business enterprise action under Tennessee law. *See also In re Southwest Equip. Rental, Inc.*, 102 B.R. at 136–39 (Discussing *Koch Refining* and *Caplin*, bankruptcy trustee lacks standing to recover unpaid wages because FLSA action is specific to employees, not general to creditors or the debtor corporation.).

Count 13 is dismissed because the trustee lacks standing.

## M. Count 14

In Count 14, Plaintiff asserts that "[d]ue to the knowing and intentional wrongful conduct of Defendants Buerger, DMW, GM, Lear and JCI, the corporate records

and accounting and financial records of Del–Met are extremely disorganized and difficult to decipher." (First Am. Compl. ¶ 67.) Plaintiff asks the court to appoint an independent auditor to sort through Debtors' books and records.

This request for an accounting or independent audit describes a remedy commonly imposed in breach of duty litigation. *See generally* Joel Eichengrun, *Remedying the Remedy of Accounting*, 60 Ind. L.J. 463, 463 (1985) ("The true accounting remedy yields a restitutionary award of the defendant's profits wrongfully obtained from use of the plaintiff's property.").

 The Sixth Circuit has described "accounting" as "a species of disclosure, predicated upon the legal inability of a plaintiff to determine how much, if any, money is due him from another." *Bradshaw v. Thompson*, 454 F.2d 75, 79 (6th Cir.), *cert. denied*, 409 U.S. 878, 93 S.Ct. 130, 34 L.Ed.2d 131 (1972). "An accounting is an extraordinary remedy, and like other equitable remedies, is available only when legal remedies are inadequate." *Bradshaw v. Thompson*, 454 F.2d at 79.

It is premature to determine whether the remedy of an accounting is warranted in this adversary proceeding.[32] Count 14 does not describe an independent cause of action.

### CONCLUSION

For the reasons stated, the Defendants' Motions to dismiss will be granted in part and denied in part by separate order.

---

**32.** Of course, Plaintiff, as the Chapter 7 trustee has the duty to "investigate the financial affairs of the debtor[s]." 11 U.S.C. § 704(5). The Bankruptcy Code authorizes the trustee to engage professionals to assist her investigation.